2010 WY 143

Peter B. KIBBEE, Appellant (Plaintiff),

v.

FIRST INTERSTATE BANK, Sheridan, Wyoming, as Trustee of the Chandler H. Kibbee Trust Agreement dated May 26, 1987, and the Mercedes K. Kibbee Trust Agreement dated May 26, 1987, as amended March 15, 1996, and any subsequent amendments thereto, the Sharon K. Lobo Charitable Remainder Annuity Trust dated September 10, 2006, the Joshua Kibbee Lobo Charitable Lead Unitrust dated November 2, 2006, the Aurora Lobo Charitable Lead Unitrust dated November 2, 2006, the Peter B. Kibbee Charitable Remainder Annuity Trust dated November 2, 2006, and as Co–Personal Representative of the Estate of Mercedes K. Kibbee, Deceased; Robert Ferril, Trustee of the Chandler H. Kibbee Trust Agreement dated May 26, 1987, and the Mercedes K. Kibbee Trust Agreement dated May 26, 1987, as amended March 15, 1996, and any subsequent amendments thereto; Chandler H. Kibbee and Mercedes K. Kibbee Foundation for Children; Sheridan County Young Men's Christian Association; Sharon K. Delobo, individually, and as Co–Personal Representative of the Estate of Mercedes K. Kibbee, Deceased; Aurora Lobo; Joshua Kibbee Lobo; Laura Galloway; Darryl Kurtz, Sr.; Darryl Kurtz, Jr.; Scott Stewart; Nadeen Iott; Harold Johnson; and Mary Sene; Appellees (Defendants).

No. S–10–0022.

Supreme Court of Wyoming.

Nov. 5, 2010.

---

Representing Appellant: Patrick J. Crank of Speight, McCue & Crank, P.C., Cheyenne, Wyoming, and Greg L. Goddard and Christopher M. Wages of Goddard, Wages & Vogel, Buffalo, Wyoming. Argument by Mr. Crank.

Representing Appellee First Interstate Bank: Tom C. Toner of Yonkee & Toner, LLP, Sheridan, Wyoming.

Representing Appellee YMCA and Other Beneficiaries: Dennis M. Kirven and Timothy J. Kirven of Kirven & Kirven, P.C., Buffalo, Wyoming. Argument by Mr. Timothy Kirven.

Representing Appellee Sharon K. de Lobo: Kim D. Cannon of Davis & Cannon, LLP, Sheridan, Wyoming.

Representing Appellees Aurora Lobo and Joshua Kibbee Lobo: Thomas M. Hogan of Hogan & Company Law Offices, Casper, Wyoming.

Before KITE, C.J., and GOLDEN, HILL, VOIGT *, and BURKE, JJ.

VOIGT, Justice.

[¶ 1] This is an appeal from the granting of multiple summary judgments arising out of a challenge by the appellant, Peter B. Kibbee, to changes made to the estate plan of his step-mother, Mercedes Kibbee. Peter asserts that documents that significantly modified Mercedes' estate plan are invalid because Mercedes lacked the requisite mental capacity, that she was unduly influenced by her previously-estranged daughter, Sharon de Lobo, and that Sharon was guilty of the tort of intentional interference with an inheritance expectancy. Finding no disputed questions of fact surrounding any of the above claims, and finding that the appellees are entitled to judgment as a matter of law, we will affirm.

## ISSUES

[¶ 2] 1. Are there disputed questions of fact regarding the decedent's mental capacity

---

* Chief Justice at time of oral argument.

at the time she executed the documents in question?

2. Are there disputed questions of fact regarding any activity by the decedent's daughter unduly influencing the decedent?

3. Should the affidavits of expert witnesses have been stricken for failure to attach the documents referenced therein and relied upon in reaching their conclusions?

4. Are there disputed questions of fact regarding whether the decedent's daughter was guilty of the tort of intentional interference with an inheritance expectancy?

## FACTS

[¶ 3] Mercedes and Chandler Kibbee were married in 1947. Both Mercedes and Chandler had been married previously. Chandler had a successful career in business, rising to become the Chief Financial Officer of Philip Morris in that company's New York City office. When Chandler retired, he and Mercedes bought land near and moved to Sheridan, Wyoming. Over the years, the Kibbees amassed a substantial estate valued at approximately $32,000,000.00. Chandler died in 1992.

[¶ 4] The appellant, Peter Kibbee, is Chandler's adopted son. Peter was raised primarily by his adoptive mother and her new husband in California, and then attended boarding school. Peter worked in Washington, D.C., but came to Wyoming almost every summer. One of the appellees, Sharon de Lobo, is Mercedes' daughter from her previous marriage. Sharon went to finishing school in Switzerland from 1955 to 1960, and then married and lived in Spain for a time but ultimately settled in New York. Although Sharon went long periods of time without visiting Wyoming, her daughter, Aurora, spent significant time at the family ranch.

[¶ 5] After Chandler's death, Mercedes established a revocable trust in 1996 ("1996 Trust"), which trust provided that upon her death: 1) the trust would pay Sharon $50,000 per year; 2) one-half of the remainder of the trust property was to go to Peter; and 3) the other one-half was to be held in trust for Sharon's daughter, Aurora.

[¶ 6] On May 18, 2000, Mercedes gave a durable power of attorney for health care to Peter and Aurora. On July 4, 2005, Mercedes fell and broke her hip and was admitted to Westview Health Care Center, a nursing home in Sheridan, Wyoming. On October 27, 2005, after Mercedes had been in the nursing home for nearly four months, her primary physician, Dr. Thomas Niethammer, noted that there was no medical reason to keep her in the nursing home, stating:

Mercedes has been in the nursing home for several months after her severe hip fracture. Rather surprisingly she has done very well. She has had no pulmonary difficulty, no exacerbation of or congestive heart failure. Recent films demonstrate at least some healing of the fracture. She is able to now stand with assistance and no weight bearing and really gone up to much discomfort.

At this point she really wants to go home. [Aurora] does not want her to go home for fear she will fall or have other trouble. . . . .

. . . .

At this point I have no medical reason to keep her in the nursing home environment as the care being provided can certainly be done in a home environment with the resources that she has available to her. [Mercedes] certainly has the resources to be cared for at home. [Aurora] does not want her at home but I do feel from a medical-legal standpoint that the patient has the right to go home and fail as long as she understands that risk which I think she does.

At this point I feel that I am in the middle of a family dispute. The patient's attorney will be a[d]dressing this issue. I do have to state that from a medical standpoint she can certainly return home with adequate caregivers.

[¶ 7] As the settlor and trustee for the 1996 Trust, Mercedes was responsible for making all decision regarding trust property. However, the 1996 Trust also provided that if two physicians certified that Mercedes had become incapable of managing her trust affairs, then she would cease to be trustee and

Peter and two other individuals would act as successor trustees. On December 22, 2005, Aurora and Peter came to Dr. Niethammer's office without an appointment and insisted that he sign an affidavit certifying that Mercedes was incapable of managing her own financial affairs. Although Dr. Niethammer signed the document, he later expressed regret, stating that it was an "intimidating situation" and indicated that he felt that he signed "under significant duress." The same day Dr. Niethammer signed the affidavit, Aurora fired him as Mercedes' physician. A second affidavit certifying that Mercedes was unable to manage her financial affairs was signed by Dr. Michele Bennett, who had not seen Mercedes since 2004, when Dr. Niethammer took over her care.

[¶ 8] A few months later, Laura Galloway, Mercedes' long-time secretary and bookkeeper visited Mercedes in the nursing home. During that visit, Mercedes asked Ms. Galloway how she could get her out of the nursing home. Ms. Galloway told Mercedes that she needed an attorney and Mercedes asked for recommendations. Ms. Galloway first recommended the attorney who assisted in administration of the 1996 Trust. Mercedes rejected this recommendation stating that she wanted her own attorney. Ms. Galloway then suggested a local attorney, Deb Wendtland. Mercedes immediately called Ms. Wendtland and left a message saying she would like to speak with her.

[¶ 9] On April 5, 2006, Ms. Wendtland answered Mercedes' second telephone call. At that time, Mercedes told Ms. Wendtland that she needed help getting out of the nursing home and that her granddaughter was forcing her to stay there. Ms. Wendtland agreed to meet with Mercedes. They met that same day and Mercedes explained that she had given Aurora a medical power of attorney, that her doctor had said she could go home with help, but that Aurora had told her she could not afford to go home, and that she wanted to hire Ms. Wendtland to get her out of the nursing home. Mercedes explained that she had plenty of money to hire help to assist her at home and while she loved Aurora, she had grown to fear her and that she had to beg Aurora to hire caregivers

to be with her at the nursing home. Mercedes said that Aurora required the staff at the nursing home and her caregivers to report to her if Mercedes had any visitors and who they were. Mercedes also expressed anger that she was not allowed to even have money to take friends to lunch.

[¶ 10] Ms. Wendtland explained that getting Mercedes out of the nursing home might damage her relationship with Aurora. Mercedes acknowledged the risk and said that she was to have lunch with Aurora the next day and would discuss her desire to leave the nursing home and give Aurora another chance to allow her to go home. Finally, Ms. Wendtland explained that Mercedes would have to revoke the medical power of attorney and indicated that it would be helpful if Mercedes had a medical checkup to confirm her mental state. Ms. Wendtland suggested Dr. Hugh K. Batty to assist her with this, and Mercedes said she would contact him and request that he meet with her.

[¶ 11] On April 8, 2006, Mercedes called Ms. Wendtland and said that Aurora had not shown up for lunch and asked Ms. Wendtland to meet with her and "bring the papers." That same day, Ms. Wendtland visited Mercedes and Mercedes signed a Revocation of Power of Attorney, terminating Peter and Aurora's power of attorney, and a Representation Agreement, retaining Ms. Wendtland as her attorney. The next day, Mercedes informed Ms. Wendtland that she had contacted Dr. Batty, who had agreed to examine her that day. Ms. Wendtland spoke to Dr. Batty who informed her that he had concluded that Mercedes was mentally competent and should be allowed to go home. Dr. Batty and another doctor, Dr. Michael J. Strahan, provided affidavits attesting to Mercedes' mental capacity and ability to manage her financial affairs.

[¶ 12] On April 10, 2006, Ms. Wendtland sent Dan Riggs, the attorney who she believed represented Peter and Aurora, a letter informing him of Mercedes' actions and Dr. Batty's examination. On April 17, 2006, Ms. Wendtland attended a meeting at Mr. Riggs' office where Aurora and Peter were present, and their attorney, Tom Hogan, participated

by telephone. Following that meeting, Mr. Hogan sent a letter indicating Peter and Aurora's consent to the Revocation of Power of Attorney, stating: "Both Aurora and Peter are in agreement with Mercedes that she is entitled to make her own health care decisions and to exercise control over the Family Trust and neither of my clients wishes to disturb her decisions."

[¶ 13] As she prepared to return home, Mercedes indicated to Ms. Wendtland that while she wanted to be in charge, she did not want to deal with bill paying and investments. Following Ms. Wendtland's suggestion, Mercedes agreed to meet with a trust officer at First Interstate Bank (First Interstate), where she was currently a customer, who could explain the services the bank could provide. After this meeting, Mercedes signed Amendment No. 3 to her revocable trust, which amendment added First Interstate as co-trustee with her during her life and provided that upon her death First Interstate and Robert Ferril would serve as successor co-trustees.

[¶ 14] As co-trustee, First Interstate was charged with gathering all of Mercedes' assets to determine the extent of her estate. On May 15, 2006, Jerry Pilch, a trust officer at First Interstate, and Ms. Wendtland met with Mercedes at her home. Mr. Pilch explained that First Interstate was beginning to understand the significant extent of her assets and was working to collect them. Ms. Wendtland stated, "I believe it was on this date that [Mr. Pilch] first raised the issue of potential tax issues and estate planning." Ms. Wendtland's notes regarding a meeting with Mercedes the following day read, in part: "Discussed problem of large estate tax due at her death. She was very upset nothing had been done. I assured her we could still fix it. I suggested we hire an attorney experienced in estate planning for large estates. She authorized me to find one." Another officer at First Interstate recommended Robert Leonard, an estate planning attorney located in Laramie, Wyoming. On June 12, 2006, Ms. Wendtland had a telephone conference with Mr. Leonard and Mr. Pilch concerning Mr. Leonard's willingness to assist with Mercedes' estate planning, and

Mr. Leonard was hired a few days later. In his representation letter, Mr. Leonard stated that he would provide "estate planning techniques or documents that may reduce your estate tax burden," which recommendations would include both "charitable and non-charitable estate planning options."

[¶ 15] After being released from the nursing home, Mercedes asked Ms. Wendtland to contact her daughter Sharon and ask that she come to visit. After Ms. Wendtland was unsuccessful in reaching Sharon, Mercedes called Sharon herself and asked her to come visit. On June 24, 2006, Ms. Wendtland picked up Sharon in Billings, Montana, and brought her to Sheridan, Wyoming.

[¶ 16] On June 28, 2006, Mercedes met with Mr. Pilch and Ms. Wendtland to discuss estate planning options. At that time, Mercedes told them that her priorities were to provide for Peter, Aurora, Sharon and Joshua (Aurora's son). She also indicated that she wanted to reduce her estate tax and liked the idea of benefitting a charity and was going to give some thought to the kind of charity she wanted to benefit. On July 5, 2006, Ms. Wendtland met with Mercedes again to ask about possible local charities she might want to benefit. Ms. Wendtland suggested the Sheridan County Dog and Cat Shelter as a possible option, and Mercedes asked for other suggestions. On July 10, 2006, Ms. Wendtland and Mercedes met again, and Mercedes indicated that she was anxious to talk to Mr. Leonard about trust changes and ways to save taxes. On July 24, 2006, Mr. Leonard, Mr. Pilch and Ms. Wendtland met in Ms. Wendtland's office to discuss Mr. Leonard's suggested estate planning options. The three then went to Mercedes' home, where Mr. Leonard presented his recommendations to Mercedes. During that meeting, Mr. Leonard explained different estate planning options, specifically addressing charitable possibilities and trust options. Mr. Leonard described the discussion with Mercedes in detail:

Q. Okay. And tell me what you recall about that discussion with [Mercedes] on July 24th, 2006.

A. Well, it was kind of a general discussion of options to change her estate plan,

and we talked about charitable possibilities. We talked about charitable remainder trusts, we talked about charitable lead trusts, and I discussed the differences between the two of them, as to what they do.

We—She expressed the desire that her plan benefit charities. She mentioned the Sheridan YMCA. She also mentioned a dog and cat shelter in Sheridan. We talked about a charitable remainder trust specifically for Sharon because she was concerned that Sharon was going to return to New York City, and the cost of living there was pretty high, and she wanted her to have some assured level of income on an annual basis. And we thought a charitable remainder trust would take care of really two things. It would provide that income for Sharon, and benefit a charity, because what happens with a charitable remainder trust after the income interest is up, the remainder goes to charity.

We also discussed the possibility of a charitable remainder trust for Peter at that point, but there was no decision made that I took at that point. And we discussed the possibility of Peter having input as to who the charitable beneficiary might be, the remainder.

Q. Who would receive the principal at the end of the series of payments, correct?

A. That's right, the charitable beneficiary, remainder beneficiary.

Q. You said there was no decision made at that time. What do you mean by that?

A. I came away from that with the idea that she wanted a charitable remainder trust drafted for Sharon, that she made that decision but no decision was made as to whether one should be done for Peter.

Q. Okay.

A. We also talked about a lead trust for Joshua because she expressed a concern that Joshua have funding for education, for his health into the future, and we talked about having a charitable lead trust that at some point in the future gave him the remainder after paying the charity for a period of time.

Q. Okay. What else do you recall discussing in that July 24th, 2006 meeting?

A. We did talk about doing the donor advised fund for the Sheridan YMCA, and I don't think we made a decision on that because she was still up in the air as to whether the Sheridan YMCA should be the primary beneficiary of the charitable activities or maybe whether other children's activities in Sheridan might be involved in that.

According to Mr. Leonard, Mercedes was alert and understood and participated in the discussion. He explained:

A. . . . We talked about the differences between charitable lead and charitable remainder trust, which is not actually a simple thing for people to understand who are lay people, but she understood the differences between the two trusts.

It was my impression that she understood what we were talking about. She participated in the conversation. She asked questions and indicated that she understood what I said, and wanted to know more about what I was saying.

[¶ 17] Following this meeting, during the months of July and August, a number of other meetings occurred between Mercedes and Ms. Wendtland to discuss and refine her wishes with respect to how the estate would pass to family members, friends, and various charitable organizations. In one of those meetings, Ms. Wendtland asked if Mercedes would authorize her to discuss the estate planning with Peter and Aurora. Mercedes responded, "Hell no. It is none of their business. Just once I wish they would be interested in me for me and not for my money. Tell them nothing."

[¶ 18] On August 13, 2006, Sharon had a conversation with Mercedes which was tape recorded. Peter repeatedly refers to this meeting as a pivotal event showing that Sharon exercised undue influence over Mercedes. The details of this meeting will be outlined and discussed in more detail in the undue influence section of the discussion below. *See infra* ¶¶ 51–52.

[¶ 19] During July and August, Mercedes had the opportunity to gain a greater understanding of the YMCA and its function. On July 16, 2006, with the help of the YMCA and

another local children's group, a number of children visited Mercedes' ranch and spent the day swimming and had a cookout on the terrace. Ms. Wendtland attended this event and explained that Mercedes spent four hours on the terrace in her wheelchair watching and talking to the children. At the conclusion of this event, Mercedes asked to have arrangements made for the children to come back the next weekend. On August 14, 2006, Mercedes met with the executive director of the YMCA and told him that her husband had been involved with the YMCA and thought highly of it and said she would like to take a tour of the facilities.

[¶ 20] On August 30, 2006, Mercedes again met with Mr. Pilch and Ms. Wendtland. At that meeting, Mercedes approved the declaration of gift to the YMCA and confirmed that she wanted to create a charitable remainder trust for Sharon, but was undecided about what to do with Peter and Aurora and wanted to give it more thought. Following this meeting, on September 7, 2006, Ms. Wendtland met with Mercedes and reviewed a Declaration of Gift to the YMCA that had been prepared by Mr. Leonard. Following Ms. Wendtland's explanation of the document, Mercedes signed the Declaration of Gift. At the conclusion of that meeting, Ms. Wendtland left Mercedes a copy of a letter drafted by Mr. Leonard discussing the charitable remainder trust he had prepared for Sharon, as well as other charitable estate planning options. On September 10, 2006, Ms. Wendtland again met with Mercedes and read to her the entire charitable remainder trust for Sharon. Sharon's trust was to be funded with $5,000,000 and would pay Sharon 5% of the initial amount for the rest of her life resulting in an annual benefit of $250,000. After reading the document, Mercedes signed it and Ms. Wendtland notarized her signature. Mercedes then indicated that she wanted to do the same thing for the rest of the family.

[¶ 21] Ms. Wendtland contacted Mr. Leonard and conveyed that Mercedes had decided to provide a similar trust for Peter and Aurora as she had for Sharon. On September 15, 2006, Mr. Leonard sent Mercedes a charitable remainder trust for Peter. Pe-

ter's trust, to be funded at $3,000,000, would pay Peter 5% per year for an annual benefit of $150,000. On October 3, 2006, Mr. Leonard sent Mercedes a proposed charitable lead trust for Joshua Lobo. Like Sharon's trust, Joshua's trust was funded at $5,000,000; however, it was to pay 7% annually to the charity with an expected remainder payment to Joshua of $8,203,000 after 25 years. Finally, on October 31, 2006, Mr. Leonard sent Mercedes a proposed charitable lead trust for Aurora. Aurora's trust was funded with $3,000,000 and would pay 8% of its annual value to charity for ten years, at which time Aurora would receive the expected remainder of $3,550,837.

[¶ 22] In late October through mid-November 2006, Mercedes was hospitalized for pneumonia and congestive heart failure. At this point Peter, Aurora, and Joshua's respective trusts had not been executed. On November 2, 2006, Mercedes contacted Ms. Wendtland and asked her to come to the hospital to see her. Mercedes told Ms. Wendtland that she wanted to sign the documents Mr. Leonard had prepared. Ms. Wendtland went to the hospital to see Mercedes and showed her each of the trusts and discussed their basic provisions. After discussing the documents with Ms. Wendtland, Mercedes signed each of them.

[¶ 23] The next day, Ms. Wendtland went back to the hospital to visit Mercedes. After a brief conversation, Ms. Wendtland asked Mercedes if she was "up to" signing three more documents and she said yes. Mercedes then signed Amendment No. 4 to the 1996 Trust, placing $2,000,000 into a health and education trust for the benefit of Sharon, Aurora and Joshua. Amendment No. 4 also created the Chandler H. Kibbee and Mercedes K. Kibbee Foundation for Children, which foundation was to receive all of the residual assets. Mercedes also signed a Codicil to the Will and a letter directing First Interstate to fund Peter, Aurora and Joshua's trusts.

[¶ 24] Mercedes was released from the hospital on November 14, 2006. The next day, Mr. Leonard came to Sheridan to meet with Mercedes and review all of the trust documents she had signed and the estate

plan which had now been implemented. Besides Mr. Leonard, Ms. Wendtland and Mr. Pilch were present in the meeting. That same day, Ms. Wendtland and Mr. Leonard sent a letter to Peter and Aurora and their attorney explaining the estate planning work that had been done. The letter described the estate plan which Mercedes had adopted and explained that Mercedes' estate had been in danger of paying 46% of its total value to the federal government and that to save several million dollars in estate taxes and leave a lasting legacy to honor the Kibbee family in the community, Mercedes had adopted the described estate plan. Peter immediately responded by letter, on November 17, 2006, writing, "I've received all the papers about the Foundation, trusts and the Ranch, and I thank you for the considerable financial package I am to receive." While expressing gratitude for Mercedes' generosity, Peter also indicated concern that the ranch was not remaining with the family:

> I recognize the good intentions in establishing the Foundation, but ask you to include the possibility of the Foundation selling the property to us (I believe it's called right of first refusal). The YMCA would get a sizable financial reward and the C Lazy M could remain in the Family, as planned.

On November 17, 2006, Ms. Wendtland signed and filed with the Wyoming Secretary of State the Articles of Incorporation of the Chandler H. Kibbee and Mercedes K. Kibbee Foundation for Children.

[¶ 25]  On February 9, 2007, Peter filed his complaint in the present case alleging that the estate planning documents signed by Mercedes in 2006 should be cancelled because they were signed while she was incompetent and subject to undue influence. The complaint was later amended to include a claim that Sharon owed him damages for intentional interference with an inheritance expectancy. Also, Peter filed a petition to have Mercedes declared incompetent and to have Aurora appointed as her guardian and conservator. Mercedes responded to the petition and submitted physician affidavits stating that she was competent. That petition,

however, was never resolved because Mercedes passed away on April 15, 2007.

[¶ 26]  On April 29, 2009, Sharon filed a motion for partial summary judgment on the intentional interference with an inheritance expectancy claim. The district court found in Sharon's favor and dismissed that claim on June 29, 2009. Summary judgment motions for the remaining issues (incompetence and undue influence) were then filed. In an effort to oppose the motions, Peter submitted the affidavits of Bruce Kahn, a psychiatrist, and Jeffrey Wallace, a physician. Both doctors opined that based on their review of certain medical records, Mercedes was incompetent at the time she executed certain of the estate planning documents. However, the medical records upon which the doctors relied in formulating their opinions were not attached to their affidavits, therefore, the district court struck the affidavits for failure to comply with W.R.C.P. 56(e). The court then addressed the motions for summary judgment and determined that Peter had failed to present evidence raising genuine issues of material fact regarding Mercedes' competence or Sharon's alleged undue influence and granted summary judgment.

[¶ 27]  Peter filed a timely notice of appeal.

### STANDARD OF REVIEW

[¶ 28]  We evaluate the propriety of a summary judgment by employing the same standards and using the same materials as the district court. *Cook v. Shoshone First Bank*, 2006 WY 13, ¶ 11, 126 P.3d 886, 889 (Wyo.2006). Thus, our review is plenary. *Birt v. Wells Fargo Home Mortg., Inc.*, 2003 WY 102, ¶ 7, 75 P.3d 640, 647 (Wyo.2003).

> Wyo. R. Civ. P. 56 governs summary judgments. A summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. W.R.C.P. 56(c). When reviewing a summary judgment, we consider the record in the perspective most favorable to the party opposing the motion and give that party the benefit of all favorable inferences which may be fairly

drawn from the record. We review questions of law *de novo* without giving any deference to the district court's determinations.

*Cathcart v. State Farm Mut. Auto. Ins. Co.*, 2005 WY 154, ¶ 11, 123 P.3d 579, 586 (Wyo.2005), quoting *Baker v. Ayres and Baker Pole and Post, Inc.*, 2005 WY 97, ¶ 14, 117 P.3d 1234, 1239 (Wyo.2005).

"A genuine issue of material fact exists when a disputed fact, if it were proven, would establish or refute an essential element of a cause of action or a defense that the parties have asserted." *Christensen v. Carbon County*, 2004 WY 135, ¶ 8, 100 P.3d 411, 413 (Wyo.2004) (quoting *Metz Beverage Co. v. Wyoming Beverages, Inc.*, 2002 WY 21, ¶ 9, 39 P.3d 1051, 1055 (Wyo. 2002)). The party requesting a summary judgment bears the initial burden of establishing a *prima facie* case for summary judgment. If he carries his burden, "the party who is opposing the motion for summary judgment must present specific facts to demonstrate that a genuine issue of material fact exists." *Id.* We have explained the duties of the party opposing a motion for summary judgment as follows:

"After a movant has adequately supported the motion for summary judgment, the opposing party must come forward with competent evidence admissible at trial showing there are genuine issues of material fact. The opposing party must affirmatively set forth material, specific facts in opposition to a motion for summary judgment, and cannot rely only upon allegations and pleadings . . ., and conclusory statements or mere opinions are insufficient to satisfy the opposing party's burden."

The evidence opposing a prima facie case on a motion for summary judgment "must be competent and admissible, lest the rule permitting summary judgments be entirely eviscerated by plaintiffs proceeding to trial on the basis of mere conjecture or wishful speculation." Speculation, conjecture, the suggestion of a possibility, guesses, or even probability, are insufficient to establish an issue of material fact. *Cook*, ¶ 12, 126 P.3d at 890, quoting *Jones*

*v. Schabron*, 2005 WY 65, ¶¶ 9–11, 113 P.3d 34, 37 (Wyo.2005).

*Hatton v. Energy Elec. Co.*, 2006 WY 151, ¶ 8–9, 148 P.3d 8, 12–13 (Wyo.2006).

## DISCUSSION

[¶ 29] In this appeal, Peter argues that there were contested issues of material fact with regard to whether Mercedes had the requisite mental capacity to execute the documents in question, and whether Mercedes was unduly influenced in executing the documents in question. Additionally, Peter claims that the district court erred in granting summary judgment on his intentional interference with an inheritance expectancy claim. We will address each of these issues in turn.

### *Mental Capacity*

[¶ 30] Peter concedes that Mercedes possessed the mental acuity to make the decision to leave the nursing home in April of 2005. However, he argues that at all points after that date, Mercedes lacked the requisite mental capacity to make estate planning and financial decisions. Although Peter's challenge to Mercedes' capacity is broad, his appellate arguments focus primarily on the irrevocable trusts Mercedes executed on September 10, 2006, benefitting Sharon, and those benefitting Peter, Aurora, and Joshua, executed between November 2, and November 6, 2006, while Mercedes was hospitalized.

[¶ 31] With regard to the mental capacity necessary to execute a trust, we have said:

"Mental incompetency, which will defeat the trust, exists where a person is incapable of understanding and acting with discretion in ordinary affairs of life, or is incapable of understanding, in a reasonable manner, the nature and effect of the trust. Strictly speaking, the question presented in such a case is not necessarily whether the settlor was generally of sound mind, but whether he had sufficient mental capacity to understand the trust which he executed."

*Hilbert v. Benson*, 917 P.2d 1152, 1156 (Wyo. 1996) (quoting *Harrison v. City Nat'l Bank*

*of Clinton,* 210 F.Supp. 362, 370 (S.D.Iowa 1962) (quoting 89 C.J.S. *Trusts* § 73 (1955))). The essential question is "whether a person is capable of understanding in a reasonable manner, the nature and effect of the act in which the person is engaged." *Hilbert,* 917 P.2d at 1156 (quoting *In re Estate of Head,* 94 N.M. 656, 615 P.2d 271, 274 (N.M.Ct.App. 1980), *cert. denied,* 94 N.M. 675, 615 P.2d 992 (1980) ). We have said that a "higher degree of mental capacity is required to execute an *inter vivos* conveyance or contract or to transact business generally, than is required in executing a will." [1] *Hilbert,* 917 P.2d at 1156. It is axiomatic that any determination of mental capacity must be made at the time when the document is executed. *Street v. Street,* 2009 WY 85, ¶ 10, 211 P.3d 495, 499 (Wyo.2009); *In re Estate of McLean,* 2004 WY 126, ¶ 10, 99 P.3d 999, 1003–04 (Wyo. 2004); *Hilbert,* 917 P.2d at 1156. "Mental incapacity is not always permanent and a person may have lucid moments or intervals when that person possesses the necessary capacity to convey property." *Street,* 2009 WY 85, ¶ 10, 211 P.3d at 499. In a trial setting, the party claiming that a document was executed by an individual without the requisite capacity has the burden to demonstrate such lack of capacity. *Hilbert,* 917 P.2d at 1156 ( [The appellant], as the one asserting incompetence, had the burden to show lack of contractual capacity by clear and convincing evidence.). However, in the context of summary judgment, the movant has the initial burden of making a *prima facie* showing of mental capacity. *McLean,* 2004 WY 126, ¶ 12, 99 P.3d at 1004.

▮▮▮ [¶ 32] To meet this initial burden, the appellees provided specific evidence regarding Mercedes' mental state at the time she executed the trusts while hospitalized.

Ms. Wendtland described her November 2, 2006, meeting with Mercedes as follows:

I directed [Mercedes] to the issue of what she wants to do with her estate when she dies. She said, "I want to get those documents signed that you have." I showed her the CRT for Joshua. She remembered on her own that Joshua wouldn't get any money from the trust until he turned age 40. She remembered on her own, that until Joshua reaches age 40, the YMCA or foundation will get the money. She signed the CRT for Joshua. She was very upset that her signature was so bad, but she was tired and weak. She insisted on getting it done. At one point I pointed to the line where she was to sign. She leaned her forehead against mine and said, "I know. I'm not a child." She signed and Nadeen witnessed.

Next I gave her Peter's trust to sign. Again, she recalled that Peter will get money each year and when he dies the rest will go to the YMCA or foundation. Again, she signed—poorly—but signed. Nadeen witnessed.

Finally I gave her the CLT for Aurora. I asked her if I needed to go over the document again with her she said: "No." She explained to me that this trust was to take care of Aurora in place of leaving her the ranch. I tried to clarify that statement by asking her: "Do you want Aurora to have the ranch?" She said: "Absolutely NO!" I said "do you want Aurora to live on the ranch so that it can go to Joshua later?" She said, "Hell, NO!" Both Nadeen and I were surprised by the strength of her conviction and the energy that it took for her to express her opinion as loud as she did. Then she said: "Let's get this signed."

*In re Estate of Roosa,* 753 P.2d 1028, 1032 (Wyo. 1988). Inasmuch as we find that Mercedes possessed the "higher degree of mental capacity" required to execute *inter vivos* documents, such as the irrevocable trusts in question here, we must likewise conclude that she possessed the lower degree of mental capacity necessary to execute the testamentary documents, such as the will codicil and trust amendments.

---

1. The elements of testamentary capacity, as distinguished from contract capacity, described in the body, are as follows:

    The testator must be able to comprehend:
    " * * * (1) [T]he extent and nature of the estate, (2) the identity of the beneficiaries and their relationship, whether by blood or circumstances, to the testator, and (3) the nature of the testamentary act, that it is a disposition of property to take effect at death." 1 Bowe–Parker, Page on Wills, supra, § 12.21 at 608 [ (1960) ].

Regarding all of the documents Ms. Wendtland observed Mercedes sign, Ms. Wendtland stated, under oath:

Each time Mercedes Kibbee signed any document prepared for her by Robert Leonard or by me, I explained the meaning and consequences of the document to her, and when [Mercedes] signed those documents, she was coherent, lucid and rational. I would not have allowed her to sign those documents if I had thought that she did not understand the nature and effect of what she was doing.

Mercedes' treating physician at the time, Dr. Hugh Batty, opined in his affidavit as to her mental state, based on personal knowledge and observations during that period:

8. In early November of 2006, [Mercedes] was hospitalized for congestive heart failure and pneumonia. She responded to treatment well. On November 2, 2006 [Mercedes'] physical condition had improved and in my opinion she was mentally able to make decisions concerning her medical care and her financial assets. On November 4, 2006 I specifically noted in my office notes that she was "able to deal with legal documents." Her physical condition continued to improve and she was discharged from the [hospital] to return to her home on November 14, 2006.

9. I am aware that [Mercedes] signed various legal documents pertaining to the disposition of assets between November 2 and November 6, 2006 and based upon my examination and care of her during that period I believe she was mentally competent to understand the legal decisions she was making.

Elaborating further, Dr. Batty described Mercedes more fully as follows:

A. Well, I thought that she possessed the executive function. I thought she had capacity, and I thought that she probably did not have Alzheimer's because of my experience and how engaging she was. She was appropriate. She was coy. She was cagey. She was interesting. She had humor and insight.

And I thought that she tired easily. But she had wit and intelligence, and I thought that she had kind of an ironic sort of personality where she would be almost like she was testing me. And I was the so-called tester, and she was testee; but she had turned it around.

Q. Was there any doubt in your mind about her capacity to understand and execute legal documents pertaining to her estate?

A. I had no—I had no thought that she could not deal with her legal documents in that regard.

The day after Mercedes was released from the hospital, Mr. Leonard traveled to Sheridan to discuss with Mercedes the changes she had made to her estate plan. Mr. Leonard described this meeting as follows:

Q. What was the purpose of that meeting?

A. That was primarily to talk about the foundation some more, and figure out what kind of a foundation we were going to do, but I also used it as an opportunity to verify for myself that [Mercedes] was the same degree of competence then as she was the last time I saw her in July, and that everything I had done for her up to that point was something that she wanted done, and that the entire plan was what she had wanted done. So we took time to go over every document again. We didn't read them, but we talked about every document, its purpose, how it fit into the plan, what the total plan was, what the tax savings were, and verified—I verified with her that all of those things were things that she wanted, she desired, and were still things that she wanted and desired on November 15th; that there hadn't been any change in her mind, and verified in my mind at that point that she was the same degree of competency she had been on July 24th, the last time I met with her. And I was quite thorough in doing that because I had not seen her since July 24th. So I wanted to verify for myself that she understood every document I prepared for her, what its purpose was, what it did, and that's what she wanted. And not only that, but every document was part of a plan that she wanted.

. . . .

Q. And as of that day, I assume you'd tell me she was tracking, she understood it all, it was her intent?

A. Oh, yeah. She was very lively, very alert. She invited my wife and I to a party she was going to be having out at the ranch that was coming up, to celebrate the forming of the foundation. And she thanked me for what I had done. . . .

[¶ 33] We have found that the first-hand observations of the decedent's attorney and treating physician provide persuasive evidence of capacity. *McLean,* 2004 WY 126, ¶¶ 12–16, 99 P.3d at 1004–05 (concluding that affidavits from attorney, treating physician, and others who witnessed the execution of the document established capacity and warranted summary judgment). In *McLean,* the Court made note of the following evidence:

> . . . the attorney who drafted McLean's will, stated that during their meetings, McLean was "coherent, alert and very assertive about her wishes," and that she "asked many questions throughout the drafting process which exhibited her understanding of the meaning of her Will and the manner in which she wished to distribute[ ] her estate."

*Id.* at ¶ 12, at 1004.

In a sworn statement, McLean's treating physician stated that after independent examination and discussion with McLean, his impression was that she was mentally and physically capable of making appropriate decisions. *Id.* at ¶ 13, at 1004. The quality and character of the evidence submitted in this case is nearly identical to that demonstrating capacity in *McLean.* We conclude, as the district court did, that the evidence presented is sufficient to make a *prima facie* showing that Mercedes had the mental capacity to execute the challenged documents.

[¶ 34] Upon this showing, the burden shifted to Peter to demonstrate, by "clear and convincing evidence," that Mercedes lacked the requisite mental capacity—that is, that she did not understand in a reasonable manner the nature and effect of the act in which she was engaged. *Hilbert,* 917 P.2d at 1156. To attempt to meet this burden, Peter asserts that the weak signatures on the documents executed while Mercedes was hospital-ized in November are evidence of Mercedes' lack of capacity. Further, Peter calls our attention to the statement of one individual who was with Mercedes right before she signed the trusts on November 2, 2006. Finally, Peter relies on the affidavits of two experts to show that Mercedes lacked mental capacity.

[¶ 35] It is true that the signatures on the documents are difficult to discern. Ms. Wendtland explained the signatures:

> That particular day [Mercedes] was laying in her bed, and she had her knees propped up; and she insisted on not letting me bring the table around so she could put the document on the table and sign on the table.

> Instead, she tried to sign this document on her knees, propped up; and it just didn't work very well.

The statement of the family friend, Ms. Ferril, is not taken from a sworn affidavit by Ms. Ferril, but instead extracted from the testimony of Ms. Wendtland, who explained the statement as follows:

> By the time I got to the hospital [Mercedes] was being helped to the restroom and so I waited in the hall and spoke to Jane Ferril. She didn't think [Mercedes] had known who she was. I went in and [Mercedes] immediately knew who I was and patted me on the cheek. I believe Jane saw this. I invited Jane to stay but she left.

> . . . Because of Jane's comment I asked [Mercedes] several different questions to assure myself that she was mentally tracking and knew what we were talking about. She answered questions about Mr. Kibbee, the ranch, her clothes at home, changes she wants to make to the ranch house, and the fact that she doesn't want to make any changes to her room.

[¶ 36] Even viewing these facts in the light most favorable to Peter, we cannot say that they are adequate to defeat the *prima facie* showing that Mercedes had the requisite capacity. Not only are both the signature and Ms. Ferril's comments explained and refuted by sworn testimony, but both

pieces of evidence are speculative, at best. We have said that:

> The evidence opposing a prima facie case on a motion for summary judgment "must be competent and admissible, lest the rule permitting summary judgments be entirely eviscerated by plaintiffs proceeding to trial on the basis of mere conjecture or wishful speculation." Speculation, conjecture, the suggestion of a possibility, guesses, or even probability, are insufficient to establish an issue of material fact.

*Hatton*, 2006 WY 151, ¶ 9, 148 P.3d at 13 (quoting *Cook v. Shoshone First Bank*, 2006 WY 13, ¶ 12, 126 P.3d 886, 890 (Wyo.2006)).

[¶ 37] The other evidence that Peter offered to rebut the *prima facie* showing by the appellees was the affidavits of two doctors, Dr. Bruce A. Kahn and Dr. Jeffrey Wallace. Neither Dr. Kahn nor Dr. Wallace had examined or treated Mercedes; nevertheless, they offered opinions, presumably to refute the opinion of Mercedes' treating physician, Dr. Batty. Both doctors opined, based on their review of the documents, as to Mercedes' mental capacity at the time she executed the documents. Dr. Wallace stated, "[t]he overwhelming majority of the medical record [sic] during this hospitalization raises serious doubts about [Mercedes'] physical and mental condition and indicates that she was lacking capacity to manage her affairs and also highly vulnerable to undue influence." Likewise, Dr. Kahn concluded: "Accordingly, it is my opinion with reasonable medical probability that [Mercedes] was likely to have been rendered mentally incapacitated to sign or otherwise execute legal documents during the time frame of October 28, 2006 through December 12, 2006."

[¶ 38] The appellees moved to strike the affidavit of both doctors on multiple grounds. Among the appellees' challenges to the affidavits was an assertion that they failed to comply with W.R.C.P. 56(e), which reads as follows:

> (e) *Form of affidavits; further testimony; defense required.* — Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. ***Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith.*** The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

(Emphasis added.) Although both affidavits referenced many medical records that the doctors reviewed and upon which they relied in reaching their conclusions, none of the records were attached to the affidavits, as required by the highlighted portion of Rule 56(e) above. Therefore, the district court granted the appellees' motion to strike the affidavits for summary judgment purposes.

[¶ 39] We find that the district court's striking of the affidavits was proper and consistent with Wyoming law. Regarding Rule 56(e), this Court has said that "[t]he Wyoming Rules of Civil Procedure were adopted to promote an orderly and efficient means for the handling and disposing of litigation. Compliance with these rules of procedure in summary judgment matters is mandatory." *Greenwood v. Wierdsma*, 741 P.2d 1079, 1084 (Wyo.1987) (quoting *Hickey v. Burnett*, 707 P.2d 741, 745 (Wyo.1985)). Rule 56(e), in specific terminology, ***requires*** that affidavits: 1) be made on personal knowledge; 2) set forth facts which are admissible in evidence; 3) demonstrate the competency of the affiant to testify on the subject matter of the affidavit; and 4) have attached to them the papers and documents to which the affidavit refers. *Bangs v. Schroth*, 2009 WY 20, ¶ 15, 201 P.3d 442, 449 (Wyo.2009).

[¶ 40] We have, on a number of occasions, deemed inadequate affidavits wherein the affiant failed to attach the document upon which the affidavit is based. *Id.* at ¶ 28, at 455 (district court erred in not striking affi-

davit where the affiant "fail[ed] to attach the medical records to which he refers" and "fail[ed] to attach a letter from [a doctor] to which he refers in paragraph nine"); *Lamar Outdoor Adver. v. Farmer's Co-Op Oil Co. of Sheridan, Wyo.,* 2009 WY 112, ¶ 12, 215 P.3d 296, 301 (Wyo.2009) (finding affidavit defective under Rule 56(e) where the affiant did not attach the application or letter of notification referred to in the affidavit); *Greenwood,* 741 P.2d at 1085–86 (two affidavits that failed to include the factual basis for conclusions and not attaching documents were insufficient).

[¶ 41]  Although Peter recognizes the general requirements of Rule 56(e) that documents referred to in an affidavit be attached, he argues that the evidentiary rules governing experts, W.R.E. 703 and 705, somehow relieve expert witnesses of this requirement. Specifically, he points to the language of Rule 703 that provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing.  If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, *the facts or data need not be admissible in evidence.*"

(Emphasis added.)  He also calls our attention to the following language from Rule 705:

> The expert may testify in terms of opinion or inference and give his reasons therefor *without prior disclosure of the underlying facts and data, unless the court requires otherwise.*  The expert may in any event be required to disclose the underlying facts or data on cross-examination.

(Emphasis added.)

[¶ 42]  Peter argues that there is an inherent inconsistency between the explicit requirement of W.R.C.P. 56(e) to provide documents and the above-emphasized language of the Evidentiary Rules. Any tension between these rules was addressed in *Western Sur. Co. v. Town of Evansville,* 675 P.2d 258, 261–63 (Wyo.1984).  There, we found deficiencies in a retained expert's affidavit submitted in response to a summary judgment motion, in large part because the affidavit did not include documents forming the basis of the expert's opinions.  We said:

> Affidavits used in summary judgment proceedings must set forth such facts as are admissible in evidence, and that is especially true when the affidavit contains significant opinions and conclusions that may be critical in the outcome of the case. *It matters not that the opinion of an expert may be admissible at trial without first revealing the underlying facts and basis for that opinion.  This is a summary judgment hearing and the requirements are different.*  The fact finder must have the material facts, determine whether they are in dispute, and if undisputed, whether judgment results as a matter of law.....
>
>  . . . .
>
> ... it is apparent that the affidavit presented by appellee, *insofar as it presents opinions and conclusions resulting from an analysis of records not before the court,* may not be considered for the purpose of awarding summary judgment.

*Id.* at 262–63 (Emphasis added.)

■  [¶ 43]  Rule 56(e)'s requirement that documents referenced in an affidavit be attached is not merely a formality or technicality.  To allow an expert to state opinions and conclusions without requiring any documented support of such not only violates the plain language of Rule 56(e), but is also contrary to the summary judgment requirement that evidence opposing a motion for summary be "competent and admissible, lest the rule permitting summary judgments be entirely eviscerated by plaintiffs proceeding to trial on the basis of mere conjecture or wishful speculation."  *Hatton,* 2006 WY 151, ¶ 9, 148 P.3d at 13.  Without the benefit of cross-examination to test the accuracy, competency, and truthfulness of expert opinions, district courts and this Court, when examining motions for summary judgment, would be left with only the bald assertions of the expert.  *Lamar,* 2009 WY 112, ¶ 12, 215 P.3d at 301 ("A party's assertion, without evidentiary support, is meaningless in summary judgment procedure.").

988

## Undue Influence

[¶ 44] We recently addressed the issue of undue influence in the execution of trusts in *Retz v. Siebrandt*, 2008 WY 44, 181 P.3d 84 (Wyo.2008). There we affirmed summary judgment against a plaintiff and said that in order to establish that a trust was executed under undue influence, the plaintiff must establish four elements: 1) the relation between the one charged with exercising undue influence and the decedent afforded the former an opportunity to control the testamentary act; 2) the decedent's condition was such to permit subversion of his freedom of will; 3) there was activity on the part of the person charged with exercising undue influence; and 4) such person unduly profited as a beneficiary under the trust. *Id.* at ¶ 19, at 91.

[¶ 45] To prevail on an undue influence claim, the plaintiff must establish all four of the above-outlined elements. This rule was aptly illustrated as follows:

In the case at bar the evidence which is undisputed or favorable to appellant indicates that, beginning in 1976, the living arrangements established by [the alleged influencer] and [the testator] provided ample opportunity for the exercise of impermissible influence. [The testator]'s alcoholism, poor health, and despondency following the death of a close companion suggest that he may have been susceptible to any influence. Furthermore, [the alleged influencer], as sole beneficiary, profited under the terms of the will to the complete exclusion of [the testator]'s son and grandchildren.

The foregoing factual information is wholly immaterial, however, unless it can be tied to evidence that [the alleged influencer] actually exerted control over the testator so as to make the 1976 instrument her will rather than his.

*In re Estate of Brosius*, 683 P.2d 663, 666 (Wyo.1984). The present case presents a similar factual scenario. The record before us reveals that the first two elements of undue influence listed above—opportunity to influence and condition such to permit subversion—were likely present in this case. *See supra* ¶ 44. Upon arriving in Sheridan,

it is undisputed that Sharon became heavily involved in the day-to-day activities of her mother. Also, Mercedes was an elderly woman suffering from many health problems. As illustrated in *Brosius*, however, such facts are immaterial unless Peter can show clear evidence of, or at least a disputed material fact surrounding, activity undertaken by Sharon to unduly influence Mercedes.

[¶ 46] Before examining the evidence surrounding the undue influence claim, we once again note that the movant has the initial burden of making a *prima facie* case for summary judgment. *McLean*, 2004 WY 126, ¶ 12, 99 P.3d at 1004. Once such a showing has been made, the burden shifts to the plaintiff to "present specific and substantiated evidence showing the existence of a material fact as to undue influence with respect to the trust document." *Retz*, 2008 WY 44, ¶ 26, 181 P.3d at 92.

[¶ 47] In order properly to examine the parties' specific arguments regarding the undue influence claim, we briefly review the factual context surrounding the creation of Mercedes' estate plan. On April 5, 2006, Mercedes contacted Ms. Wendtland to assist her in securing release from the nursing home. From that point until Mercedes passed away, Ms. Wendtland represented and assisted Mercedes in resolving and/or facilitating the resolution of her legal issues and in bringing about the changes to her estate plan. It was Ms. Wendtland who drafted and assisted Mercedes in executing the document revoking Peter and Aurora's power of attorney and Amendment No. 3 to her revocable trust, which amendment added First Interstate as co-trustee and provided that upon her death First Interstate would serve as successor co-trustee. Also, it was Ms. Wendtland who assisted Mercedes in hiring First Interstate to help her manage her trust and handle her finances. Representatives from First Interstate first raised the issue of the substantial tax liability to which Mercedes' estate would be subject unless modification to her estate plan was made. Likewise, it was a representative from First Interstate who suggested hiring Mr. Leonard to address this problem. Ms. Wendtland set up the meeting with Mr.

Leonard, and a representation agreement between Mr. Leonard and Mercedes was signed on June 23, 2006.

[¶ 48] It is undisputed that Sharon was not even in Sheridan, Wyoming, and had not spoken with Mercedes in many years when the above-outlined events occurred. These events were the groundwork for Mercedes' modification of her estate plan, and all these events occurred before Sharon was even in the picture. The impetus and genesis of the modified estate plan was First Interstate's concern with tax consequences. The details and drafting of the estate plan arose primarily from Mr. Leonard's expertise and recommendations, and the execution of the estate plan was facilitated by Ms. Wendtland. Peter does not dispute the independence of either Ms. Wendtland or Mr. Leonard. We find the involvement of these two, and other professionals, to be significant in our analysis of whether Sharon was able to exercise undue influence. Regarding the effect of independent legal counsel in undue influence disputes, it has been said:

> Independent or disinterested advice is legitimate and appropriate, and the testator's receipt of independent competent advice is relevant to determining whether there was undue influence, including particularly independent advice from attorneys or investment counselors. The lack of advice from an independent attorney may also be a factor in determining whether there was undue influence.

79 Am.Jur.2d *Wills* § 390 (2002).

[¶ 49] In making their *prima facie* showing of a lack of undue influence, the appellees argue that not only were Ms. Wendtland and Mr. Leonard integral in formulating and executing Mercedes' estate plan, but the record indicates that they were vigilant in ensuring that the plan reflected Mercedes' wishes, and that Sharon was not involved in the decisions surrounding the estate plan. Mr. Leonard testified as follows about these efforts:

Q. [By Peter's Attorney] And did that cause you concern as the estate planner, that maybe [Sharon] was exercising undue influence?

A. No.

Q. And why was that?

A. Because I felt that between [Ms. Wendtland] and I, and a little bit of involvement by First Interstate, that we were assuring ourselves every step of the way that what was being done here is what [Mercedes] wanted, not what Sharon wanted.

Mr. Leonard further testified concerning the lack of influence Sharon had on his work for Mercedes:

Q. To the best of your knowledge, Mr. Leonard, did [Sharon] ever attempt to influence Mercedes Kibbee concerning the terms of the trusts that you drafted and were established or any other element of Mercedes Kibbee's estate planning?

A. To the best of my knowledge, no. We tried to take precautions to prevent that.

Q. And exactly what precautions were taken?

A. In having the documents executed with Sharon not being present; having meetings without Sharon being present; going back over and reading the documents to [Mercedes], make sure she understood them without Sharon being present. Going over my letters without Sharon being present, with the exception, apparently Sharon did review one of my letters; August 30th, I think, letter, if I recall.

Q. To the best of your knowledge did [Sharon] ever express an opinion as to the terms of any of the charitable trusts that were drafted by you and executed by [Mercedes]?

A. She never expressed an opinion to me, no.

Q. Were you aware of any opinion that she ever had concerning the amount of principal of the, either of the charitable remainder trusts that were established for herself or Peter Kibbee?

A. No. The only opinion I'm aware of that she may have expressed was with respect to the foundation's structure.

Q. And was that opinion expressed after November 15, 2006?

A. Yes.

Q. Did you ever have any discussion with [Sharon], or did she attempt to have any

discussion with you about the terms of any of the these charitable trusts?

A. No.

Q. Was [Sharon] present at any time you were discussing matters with Mercedes Kibbee pertaining to the estate planning or terms of the trust?

A. [Ms. Wendtland]'s chronology reflects she was at the meeting November 15th, but I don't recall that, and I don't recall her being there specifically when I was going over the terms of the charitable trust with [Mercedes]. She might have been there later when we were going over the foundation terms, but I don't recall her being there at all when we were discussing the overall plan and the terms of the trust.

Q. At any time, at any meeting or telephone call that you had with Mercedes Kibbee prior to November 15th, 2006, was [Sharon] present?

A. No.

Likewise, Ms. Wendtland unequivocally testified that Sharon was not involved in Mercedes' estate planning decisions:

Q. And at some point [Sharon] also became actively involved in estate planning for [Mercedes]?

A. No.

Q. Well, there was a presentation that she did that was a CD presentation and posters. Were you present for that?

A. No. I think that had to do with the foundation.

Q. All right. Well, when was her first involvement with regard to the estate planning.

A. Well, Sharon was never present for any of my and [Mr. Pilch]'s meetings with [Mercedes]. And Bob Leonard's meetings with [Mercedes], Sharon was never present for those. She was never present for any of the signing of the documents, either.

We conclude that the above testimony is adequate for the appellees to meet their *prima facie* burden of showing that Sharon undertook no activity to unduly influence Mercedes.

[¶ 50] To refute these facts, Peter points to very few specific facts, but rather makes broad arguments such as the following:

Upon arriving in Sheridan, Wyoming, [Sharon] deliberately and intentionally became the sole person who controlled Mercedes Kibbee's entire environment at the family ranch. [Sharon] became the person who supervised the caretakers who were providing medicine and daily care to Mercedes Kibbee. [Sharon] became the person who cooked meals for Mercedes Kibbee. [Sharon] became the person who solely controlled the operation of the house and ranch, and who had access to Mercedes Kibbee. [Sharon] was the only person who had 24 hours a day, 7 days a week, 365 days a year access to Mercedes Kibbee. Based on her total control of the environment and circumstances of Mercedes Kibbee's daily living activities, [Sharon] was able to unduly influence the ultimate disposition of an estate valued in excess of $32,000,000.

Although many of Peter's statement above are true, such is not sufficient to establish undue influence without some evidence of actual activity by Sharon subverting Mercedes' freedom of will. *Brosius*, 683 P.2d at 666.

[¶ 51] The one event to which Peter repeatedly refers is an August 13, 2006, tape-recorded conversation between Mercedes and Sharon. Peter quotes a few specific comments made by Sharon during this conversation which, he argues, "clearly and unequivocally show[ ] undue influence." The first was when Sharon stated to Mercedes, "My agenda was and I brought it to you. This project for the children that Aurora could work for. So, I brought it to you at that time it was my agenda." Peter claims that this demonstrates that Sharon was trying to force her "agenda" onto Mercedes. To show Mercedes' frail state, Peter argues that Mercedes' "sole concern" during this meeting was when her pain medication was going to kick in. As evidence for such, he quotes a portion of the transcribed conversation when Mercedes states, "How long ago did I take that pill?" To which an unidentified person responded "About a half an hour. It takes

about an hour to work." Finally, Peter argues that Sharon's intent to unduly influence Mercedes is graphically illustrated by a chart Sharon used during this conversation to illustrate the estate plan. The chart diagramed the estate plan and Sharon's ideas for the foundation and included pictures of children. Peter argues that there is no reason to have the pictures of the children other than to influence Mercedes. Regarding this meeting, Peter states:

> When faced with uncertainty that Mercedes Kibbee might not follow the estate plan dreamed up and devised by [Sharon], [Sharon] captured Mercedes Kibbee in a room, presented her with a written estate plan surrounded by pictures of unfortunate children, and made poor Mercedes Kibbee try and relate what her intent might be.

[¶ 52] When we review the entire transcript of the recorded meeting and consider it in light of all the facts and circumstances, we cannot agree with Peter's interpretation of the nature of this meeting, or his conclusion that this meeting clearly and unequivocally demonstrates Sharon's undue influence. The transcript shows that Mercedes was aware and engaged in the discussion. Contrary to Peter's assertions, nothing in the transcript supports his assertion that Sharon "captured" Mercedes in the room, or that Mercedes' sole concern was with her medication. At the beginning of the conversation, Sharon and Mercedes carried on a lengthy conversation about family animals and where Mercedes and Sharon planned to go for lunch. Nothing indicates that Mercedes was being held, or forced to carry on the conversation against her will. Mercedes was engaged in the conversation and clearly expressed her goal to change her estate plan so that Aurora would have to work instead of living off Mercedes' assets. Also, the transcript shows that Mercedes did not simply adopt Sharon's suggestions, but instead that she indicated that she wanted more information about the project and would think about it. What is most telling is that Mercedes' final estate plan differed significantly from that presented by Sharon and illustrated on the poster board.

[¶ 53] As noted above, to succeed in a claim of undue influence, the proponent must "present specific and substantiated evidence showing the existence of a material fact," and "clear proof of" each of the elements of the undue influence claim. *Retz,* 2008 WY 44, ¶¶ 26, 30, 181 P.3d at 92, 93; *In re Estate of Anderson,* 71 Wyo. 238, 249, 255 P.2d 983, 986 (1953) ("Clear proof of such influence is required in order that a solemnly executed statement may be set aside for undue influence."). Peter simply fails to present the clear evidence required to show undue influence, or disputed material facts regarding that question. Instead, the undisputed facts show that Sharon was absent not only during the time when the initial decision to modify the estate plan was made, but was also excluded from virtually all discussions between Mercedes and her attorneys concerning her estate planning. Furthermore, many undeniably independent professionals worked with Mercedes in crafting and executing her estate plan. Each of these professionals was cautious and thorough in his or her efforts to ensure that Mercedes' wishes were honored, and that her decisions were made independent of outside influences. Even viewing the facts in the light most favorable to Peter, we cannot say that there are disputed material facts regarding whether Mercedes was subjected to undue influence.

### Intentional Interference with an Inheritance Expectancy

[¶ 54] In this last issue, Peter challenges the district court's summary judgment ruling in favor of Sharon on his asserted tort claim of intentional interference with an inheritance expectancy. This claim was not asserted until October 10, 2008, nearly two years after the original complaint was filed. The amended complaint asked for damages, including punitive damages, resulting from Sharon's alleged interference with Peter's inheritance expectancy. In her motion for summary judgment, Sharon argued that even if the district court decided to adopt this new tort, Peter was required to assert the tort claim in the probate proceedings, and his failure to do so barred the claim. The district court, in granting summary judgment to Sharon, stated:

This is not a tort which has been recognized in Wyoming. *Spear v. Nicholson*, 882 P.2d 1237 (Wyo.1994). The cause of action might be appropriate in some circumstances, as in the *Spear* case, where the contestants had filed a claim in the probate action. If a probate court determined that there was undue influence, then it might follow that the responsible party could be held to answer in a tort action. However, that is not the case here. Plaintiff did not file claims in probate or with the trustee. Allowing this tort claim to proceed could result in a situation where there are contradictory rulings as to the intent of the deceased.

[¶ 55] This appellate issue raises three separate questions: 1) whether adoption of this new tort is appropriate; 2) whether such a tort claim may be properly asserted outside of probate court; and 3) whether there are disputed questions of fact, and if not, which party is entitled to judgment as a matter of law. The first question is a threshold issue that must be answered, inasmuch as any decision on the other two questions would be premature if the new tort is not adopted.

[¶ 56] This Court has always been very cautious and deliberate in deciding whether to adopt new causes of action. *See Borns ex rel. Gannon v. Voss*, 2003 WY 74, ¶¶ 34, 35, 70 P.3d 262, 275 (Wyo.2003) (recognizing that dog bite liability would be best addressed by the legislature and appellant had other viable causes of action without adopting new rule); *Hoblyn v. Johnson*, 2002 WY 152, ¶ 22, 55 P.3d 1219, 1227 (Wyo.2002) (rejecting claim where important public policy in conflict with tort and appellants failed to state *prima facie* case of elements); *Hulse v. First Amer. Title Co.*, 2001 WY 95, ¶ 48, 33 P.3d 122, 137 (Wyo.2001) (refusing to adopt tort where appellants failed to demonstrate a duty); *Richey v. Patrick*, 904 P.2d 798, 802–03 (Wyo.1995) (declining request to adopt tort of nondisclosure because appellants' claim would fail); *Cosner v. Ridinger*, 882 P.2d 1243, 1248 (Wyo.1994) (declining to adopt tort of interference with parental rights because the appellant was non-custodial parent). Regarding the specific tort or intentional interference with an inheritance

expectancy, we have had one prior occasion to consider its adoption in *Spear v. Nicholson*, 882 P.2d 1237 (Wyo.1994). There, as here, the district court did not explicitly make any decision on whether or not the tort should be recognized in Wyoming. *Id.* at 1240. As such, on appeal we declined to address the question, stating:

> As part of their appeal, the children suggest we should recognize the torts of intentional interference with expectancy and civil conspiracy as causes of action in Wyoming. The trial court did not reach that issue, and it would be premature for us to address it. Our rule is that we do not furnish advisory opinions.

*Id.* at 1242.

[¶ 57] We find the record before us to be insufficient to allow us to undertake the careful and deliberate analysis required to warrant adoption of a new tort. Although Sharon argues against the adoption of the tort in her appellate brief, Peter's brief virtually ignores the issue and focuses almost exclusively on attacking the district court's finding that the probate court is the proper forum within which to assert such a claim. It is not until near the end of his argument that Peter makes any sort of substantive statement regarding the tort, when he says, "[t]he issue that should have been considered by the court was whether there were material facts in dispute regarding whether [Sharon] intentionally interfered with [Peter's] expectancy of an inheritance." This is the extent of his argument regarding the viability of his claim for the tort of intentional interference with an inheritance expectancy. Sharon points out Peter's failure to designate any materials or facts to support this unrecognized claim. In response, Peter states that a "Supplemental Rule 56.1 Statement as well as the additional materials filed in opposition to [Sharon's] Motion for Summary Judgment showed that there were material facts in dispute which precluded a grant of summary judgment on this claim." The Rule 56.1 statement to which Peter refers consists of four enumerated sentences, none of which sets forth the elements of the tort, make any arguments in favor of adoption of the tort, or contain any analysis or discussion of the facts

as they relate to the tort.[2] Although Peter claims the record contains "additional materials" supporting his claim, he does not specify the location or substance of such. In fact, in the summary judgment proceedings, although it appears that Peter filed a response to Sharon's motion for summary judgment, that response is inexplicably absent from the record.

[¶ 58] As we have said many times, the appellant carries the burden of bringing a complete record to this Court for review. *Stroup v. Oedekoven*, 995 P.2d 125, 129 (Wyo.1999). In *Retz*, 2008 WY 44, ¶ 15, 181 P.3d at 90 n. 2, we discussed this concept in the context of summary judgment, stating:

> Appellants filed several motions and supplements in opposition to the motions for summary judgment, but only designated one of those for inclusion in the record on appeal. Although we review a grant of summary judgment *de novo*, that standard does not alter the fact that we only consider the portions of the record that the parties have properly designated for appellate review. In this case, we have considered the arguments made and the exhibits cited in the documents we have in the record.

"When a party fails to provide pertinent legal authority, cogent argument, or factual support for an issue, we cannot provide meaningful review." *Davison v. Wyo. Game Fish Comm'n*, 2010 WY 121, ¶ 39, 238 P.3d 556, 568 (Wyo.2010); *see also Kruckenberg v. Ding Masters, Inc.*, 2008 WY 40, ¶ 25, 180 P.3d 895, 903 (Wyo.2008).

[¶ 59] Given the relative dearth of argument, factual analysis, or legal support found in the record supporting Peters claim for adoption of the tort of intentional interference with an inheritance expectancy, we find that this is not a proper case within which to undertake such action. Therefore, we will affirm the district courts award of summary judgment on the appellants claim. *Duncan v. Town of Jackson*, 903 P.2d 548, 551 (Wyo. 1995) (We will affirm a grant of summary judgment if it can be sustained on any legal ground appearing in the record.).

## CONCLUSION

[¶ 60] Upon plenary review of all the evidence submitted, and viewing the facts in the light most favorable to Peter, we affirm the granting of summary judgment on all issues raised on appeal. Peter has failed to demonstrate a disputed question of material fact regarding Mercedes' mental capacity to execute the estate planning documents, or Sharon's alleged undue influence. Furthermore, because Peter has failed to present cogent argument or cite to pertinent authority favoring adoption of the tort of intentional interference with an inheritance expectancy, we will affirm the summary judgment regarding that claim as well.

---

**2.** The four enumerated sentences read:
   1. Defendant Sharon De Lobo exercised undue influence over Mercedes Kibbee prior to her death in an effort to cause her to change her estate planning documents.
   2. Defendant Sharon De Lobo intentionally interfered with Plaintiff's with [sic] expectancy to inherit from Mercedes Kibbee.

   3. Plaintiff did submit a claim to the trustee in the form of a civil complaint.
   4. This complaint notified the trustee that there were challenges to the validity of the trust.