# THE SUPREME COURT, STATE OF WYOMING

## 2023 WY 2

OCTOBER TERM, A.D. 2022

January 19, 2023

KELLY WILCOX,

**Appellant**
**(Plaintiff),**

v.

S-22-0062

SECURITY STATE BANK,

**Appellee**
**(Defendant).**

*Appeal from the District Court of Big Horn County*
*The Honorable Bill Simpson, Judge*

*Representing Appellant:*
Mark D. Sullivan of Mark D. Sullivan, P.C., Wilson, Wyoming. Argument by Mr. Sullivan.

*Representing Appellee:*
Megan O. Goetz and Crystal D. Stewart of Pence and Macmillan, LLC, Laramie, Wyoming. Argument by Ms. Goetz.

*Before FOX, C.J., and KAUTZ, BOOMGAARDEN, GRAY and FENN, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**FENN, Justice.**

[¶1]    This case arises out of several agricultural loans Kelly Wilcox obtained from Security State Bank (SSB).  When she defaulted on the loans, SSB foreclosed on some of the collateral Mrs. Wilcox pledged to secure these loans.  Mrs. Wilcox filed suit against SSB alleging negligent lending and negligent advising, breach of the covenant of good faith and fair dealing, breach of fiduciary duty, negligent misrepresentation, intentional misrepresentation, and fraud. SSB counterclaimed for breach of contract, unjust enrichment, promissory estoppel, negligent misrepresentation, intentional misrepresentation, fraud, and breach of the covenant of good faith and fair dealing.  The district granted summary judgment in favor of SSB on Mrs. Wilcox's claims and on SSB's breach of contract counterclaim.  Mrs. Wilcox appeals.  We affirm.

## ISSUES

[¶2]    We rephase the issues as follows:

> I.      Does Wyoming recognize a cause of action for negligent lending or negligent advising?
>
> II.     Did the district court err when it granted summary judgment in SSB's favor on the breach of good faith and fair dealing claim?
>
> III.    Did the district court err when it granted summary judgment in SSB's favor on the breach of fiduciary duty claim?
>
> IV.     Did the district court err when it found equitable defenses did not preclude granting summary judgment in SSB's favor on its breach of contract counterclaim?

## FACTS

[¶3]    Kelly and James (Jim) Wilcox[1] are cattle ranchers with more than 40 years of experience.  In 2006, Kelly began suffering from severe health issues, so the Wilcoxes took a hiatus from running their own ranching business while Kelly was ill.  They started raising cattle again in 2011 or 2012.  Kelly's father purchased 48 heifers as a gift to the Wilcoxes. By 2017, the Wilcoxes had grown their herd to between 160 and 200 cattle.  The Wilcoxes did not own enough land to graze their cattle, so they secured a lease for a summer pasture

---

[1] For clarity when discussing Kelly or Jim individually we will refer to them by their first names.

1

in Jeffrey City, Wyoming, and a winter pasture in Meeteetse, Wyoming. When necessary, the Wilcoxes also utilized a local feedlot called TD Farms.

[¶4]    By early 2017, the Wilcoxes had accumulated accounts payable of between $60,000 and $70,000, including a $40,000 bill to TD Farms. The owner of TD Farms recommended the Wilcoxes approach SSB to obtain a loan to pay their accounts payable. In the spring of 2017, the Wilcoxes met with Matthew Schneider, who was then the Senior Vice President of SSB, to discuss obtaining a loan to pay their accounts payable, increase the size of their herd, and provide some operating capital. Their goal was to build their herd up to 500–600 head of cattle. When the Wilcoxes met with Mr. Schneider, they told him about Kelly's health issues and the financial difficulties it caused. Because of Jim's credit issues and criminal probation conditions that prohibited him from owning animals, the loan application was made solely in Kelly's name.

[¶5]    SSB initially declined to loan Kelly any money. SSB was concerned about Kelly only having cattle as collateral, given the volatility of the cattle market. A few days after SSB notified Kelly she had not been approved for any loans, Jim called Mr. Schneider and offered to pledge Kelly's father's house in Thermopolis, Wyoming, as additional collateral. With this additional collateral, SSB approved Kelly's request for a loan to purchase additional cattle and an operating loan.

[¶6]    In June 2017, after Kelly applied for the cattle purchase and operating loans, but before the loans had been processed, the Wilcoxes approached Mr. Schneider with what they called the Heiferette Proposal. Their leased summer pasture had more than enough grass to serve their existing herd, and the Wilcoxes had the opportunity to purchase 200 additional heifers. They intended to breed these heifers to their bulls and sell them as bred cows a few months later, quickly generating approximately $130,000 of income. Mr. Schneider told the Wilcoxes he would present the Heiferette Proposal to the loan committee. Ultimately, SSB did not finance the Heiferette Proposal, and the Wilcoxes were unable to avail themselves of the opportunity to quickly generate income.

[¶7]    On July 3, 2017, SSB made two loans to Kelly, a $140,000 term loan to purchase cattle (Cattle Purchase Loan) and a $125,000 operating line of credit (First Operating Loan). Kelly and Jim believed their existing accounts payable would be added to the term loan for the cattle purchase. However, SSB did not structure the loans that way. Instead, the accounts payable were paid from the First Operating Loan. This left the Wilcoxes with only about $55,000 for operating capital for the rest of the 2017–2018 business year. Mr. Schneider also informed Kelly she had been approved for an additional $50,000 short-term operating loan (Second Operating Loan) in case she needed it. Over the next two days, the Wilcoxes used the Cattle Purchase Loan to buy 109 heifers and 11 bulls. The Wilcoxes and SSB knew these new heifers would not produce a calf crop to service the debt to SSB until October 2018.

[¶8]    Also in July 2017, Kelly and Mr. Schneider discussed the possibility of purchasing a camper for the Wilcoxes to live in during the summer so they could be closer to their livestock at the Jeffrey City pasture.  SSB loaned Kelly $27,215 to purchase a new Winnebago (the Winnebago Loan).  The Wilcoxes spent most of the First Operating Loan by October 2017.  Kelly signed additional loan documents and received the $50,000 Second Operating Loan.  This loan was set to mature on December 31, 2017.

[¶9]    In the fall of 2017, the Wilcoxes discussed with Mr. Schneider the possibility of building their own feedlot on their leased winter pasture in Meeteetse so they could avoid paying the high costs of using a commercial feedlot.  This project became known as the Winter Camp.  The project required the Wilcoxes to drill a water well and build corrals on the leased land.  The owner of the leased pasture verbally approved the construction of the Winter Camp on his property.  The Wilcoxes initially estimated the cost of building the Winter Camp to be $23,517.  Mr. Schneider believed the Winter Camp was a good idea because it would ultimately reduce the Wilcoxes' expenses.  Mr. Schneider took the matter of the Winter Camp to the loan committee, and they approved it.

[¶10]  In the fall of 2017, the Wilcoxes were able to gather all their cattle from the summer pasture, which meant they were within $1,000 of the projections they had presented to SSB that spring.  Mr. Schneider was very pleased.  Kelly and Jim were concerned about servicing their debt with only 300 cows.  The Wilcoxes asked Mr. Schneider if they could keep 40 heifer calves that had been produced by their existing herd.  The Wilcoxes testified Mr. Schneider gave them permission to keep the heifers.  The Wilcoxes cut out 40 heifer calves and sold the rest.  In December 2017, Kelly provided SSB with a check for $61,961.07 derived from the sale of the calves.

[¶11]  The Wilcoxes met with Mr. Schneider in December 2017.  The parties disagree about what occurred at this meeting.  Kelly testified Mr. Schneider told them the loan documents for their 2018 operating loan would be ready in two weeks, although he did not promise the loan would be for a certain amount of money.  Kelly also testified Mr. Schneider gave her permission to start construction of the Winter Camp, and he told them he was going to set up a new term loan to cover the costs of constructing the Winter Camp. The Wilcoxes testified Kelly brought checks with her to this meeting that were to pay their feed bills to TD Farms and Wyoming Sugar Beet Company.  According to the Wilcoxes, Mr. Schneider told Kelly not to pay the feed bills until their 2018 operating budget was complete, but he authorized her to pay the contractor who had drilled the water well at the Winter Camp.  Kelly only had $11,000 available from the Second Operating Loan at this time, so the checks to TD Farms and Wyoming Sugar Beet Company would not have cleared unless SSB lent her additional funds.

[¶12]  Mr. Schneider testified he did not remember Kelly bringing any checks to the December meeting. He also testified they did not discuss the Wilcoxes' need for additional operating capital or their outstanding debt to TD Farms.  Mr. Schneider also testified he

3

told the Wilcoxes they could keep the 40 heifers if they provided SSB a revised plan showing they could service their debt without selling those calves. Mr. Schneider denied telling the Wilcoxes he would start preparing loan documents for a 2018 operating loan at that meeting. However, he admitted SSB verbally committed to lend the Wilcoxes $23,517 for the construction of the Winter Camp.

[¶13] Mr. Schneider was promoted to president of SSB's Worland branch in January 2018. The Wilcoxes allege Mr. Schneider became extremely difficult to contact after his promotion. Kelly became increasingly concerned about the status of their new loans, and she repeatedly contacted SSB. When she was unable to reach Mr. Schneider, she would ask his assistant about writing checks to cover Winter Camp or 2018 operating expenses, and she was told to "[j]ust do what [she] need[ed] to do." When the Wilcoxes were still unable to reach Mr. Schneider, Jim started showing up at the bank unannounced asking to see him. It took several tries, but Jim was ultimately able to meet with Mr. Schneider. One of the objectives of Jim's unannounced visits was to make Mr. Schneider aware that the costs for the Winter Camp were exceeding projections. By February 2018, the Winter Camp expenses had grown to over $38,000. Jim stopped by the bank and talked to Mr. Schneider on three occasions. On each occasion, Mr. Schneider assured Jim SSB was working on the paperwork for the new loans, and it would be ready in another two weeks.

[¶14] Mr. Schneider testified when Jim stopped by the bank in the middle of January, he told Jim that SSB needed a revised cash flow and an updated financial statement before it could process the loans. Jim told Mr. Schneider that Kelly would prepare those documents. Mr. Schneider testified SSB kept trying to schedule meetings with the Wilcoxes, but SSB was unable to get the Wilcoxes to come into the bank. However, Mr. Schneider admitted in his deposition that on at least one occasion, he purposely left the bank and did not come back until after his assistant notified him the Wilcoxes had left because he did not want to cross paths with Jim.

[¶15] Kelly continued to write checks to pay for Winter Camp expenses and 2018 operating expenses. She called or emailed SSB whenever she needed to write a check. Writing these checks caused Kelly's checking account to become overdrawn, and Mr. Schneider approved these overdrafts until they exceeded his approval limit. Once the overdraft exceeded $50,000, the overdrafts were approved by SSB's chief credit officer and corporate president, Steve Cady. Kelly's checking account eventually became overdrawn by more than $60,000, and over $42,000 of this amount was spent on the construction of the Winter Camp.

[¶16] The Wilcoxes took their cattle to TD Farms while they were building the Winter Camp. The Wilcoxes were able to move most of their cows to the Winter Camp in March 2018, even though TD Farms had not been paid. The Wilcoxes left their bulls at TD Farms because the corral for the bulls was not ready yet. They also left four cow-calf pairs at TD Farms because the newborn calves were too young to move. When the last corral was

4

finished, Kelly asked Mr. Schneider to pay the outstanding balance to TD Farms so their bulls would be released. Kelly testified SSB refused to allow any payment to TD Farms despite repeated requests.

[¶17] From February 2018 to May 2018, Mr. Schneider prepared several different loan presentation narratives asking the loan committee to create a term loan for the Winter Camp expenses and provide Kelly additional operating capital. In April 2018, Mr. Schneider met with the Wilcoxes and informed them SSB would not loan them additional funds unless they sold the 40 heifer calves they had kept, obtained a guarantee from the Farm Services Agency, and renegotiated the payment terms of their summer pasture lease, requiring the owner of that pasture to accept a lump sum payment in the fall after the calves were sold.

[¶18] By May of 2018, SSB wanted to end its relationship with the Wilcoxes. Mr. Schneider created yet another loan packet, which he claimed was SSB's best plan to have the Wilcox credit exited from the bank by December of 2018. This proposal extended the maturity dates of Kelly's existing lines of credit and required her to sign loan documents to cover the overdraft. Under this plan, Kelly would either have to refinance the debt or sell the herd to pay off the debt by the end of 2018.

[¶19] After learning SSB would not be extending additional funds, the Wilcoxes attempted to find alternative financing. The Wilcoxes met with several banks and private lenders, but no one would extend credit to the Wilcoxes until Kelly took care of the overdraft.

[¶20] Kelly continued to try to resolve her issues with SSB and TD Farms. SSB refused to pay the feed bill, and in August of 2018, TD Farms issued a notice of its intent to sell the bulls pursuant to a feed lien. TD Farms held the auction on September 27, 2018, and SSB permitted the Wilcoxes to repurchase three bulls at a cost of $5,800. The remaining 17 bulls and 4 cows[2] were sold for $19,246.20. TD Farms kept all the proceeds from this sale pursuant to its feed lien.

[¶21] SSB repeatedly contacted Kelly asking her to sign debt modification documents to extend the maturity dates of some of her loans and new loan documents to cover the $65,000 overdraft. SSB sent two employees to the Wilcox home on September 4, 2018, to obtain Kelly's signature on these documents. Kelly told them she wanted to speak to Doug Crouse, the owner of SSB, or Mr. Cady before she signed the documents. The SSB employees left, but Kelly received a call informing her that if she did not come in to sign the paperwork by noon the next day, SSB would initiate legal action against her. Kelly signed these documents two days later.

---

[2] The Wilcoxes were told all four calves that had been born to these cows died at TD Farms, so these calves were not included in the auction.

[¶22] The Wilcoxes gathered their remaining cattle from the Jeffrey City pasture in October 2018. They moved their cattle to a feedlot called L&C Farms in Riverton, Wyoming.[3] Kelly intended to sell the 2018 calf crop to pay down her debt to SSB. The Wilcoxes sold 120 calves in November 2018, for a total of $54,238.87.[4]

[¶23] In early January 2019, SSB notified the Wilcoxes it intended to take control of the remaining livestock and sell them at two auctions later that month. The Wilcoxes filed for chapter 11 bankruptcy on January 11, 2019. SSB moved to lift the automatic stay, claiming its collateral was in jeopardy. SSB and L&C Farms moved to dismiss the Wilcoxes' bankruptcy. The bankruptcy court issued an order permitting SSB to liquidate the Wilcoxes' herd. SSB held a liquidation sale, and the Wilcoxes dismissed their bankruptcy petition.

[¶24] Kelly filed suit against SSB, alleging five causes of action: 1) negligent misrepresentation; 2) negligent lending and negligent advising; 3) intentional misrepresentation and fraud; 4) breach of the covenant of good faith and fair dealing; and 5) breach of fiduciary duty. SSB filed several counterclaims: 1) breach of contract; 2) unjust enrichment; 3) promissory estoppel; 4) negligent misrepresentation; 5) intentional misrepresentation; 6) fraud; and 7) breach of the covenant of good faith and fair dealing. SSB moved for summary judgment on all of Kelly's claims. SSB also moved for partial summary judgment on four of its counterclaims: breach of contract, breach of the covenant of good faith and fair dealing, unjust enrichment, and promissory estoppel. Kelly withdrew her claims for negligent misrepresentation, intentional misrepresentation, and fraud, and the district court entered an order dismissing those claims. Kelly opposed SSB's summary judgment motions on her remaining claims and its counterclaims, claiming this was a fact-intensive case that was not appropriate for summary judgment. She asserted although Wyoming had not yet recognized a cause of action for negligent lending or negligent advising, it had discussed such claims in *Birt v. Wells Fargo Home Mortgage, Inc.*, 2003 WY 102, 75 P.3d 640 (Wyo. 2003), and this case presented facts supporting the adoption of those causes of action. Kelly also alleged in *Martinez v. Associates Financial Services Co. of Colorado, Inc.*, 891 P.2d 785 (Wyo. 1995), the Wyoming Supreme Court recognized a cause of action for breach of fiduciary duty against a lender might arise in special circumstances. She alleged there were questions of fact about whether SSB exercised control over her operation, gave her advice about that operation, and whether a special relationship existed between Kelly and SSB. Kelly also claimed there were questions of fact precluding summary judgment on her breach of good faith and fair dealing claim. She alleged SSB evaded the spirit of the parties' agreements, lacked diligence in the handing of her loans, and abused its power to specify terms. Finally, Kelly alleged there were

---

[3] Kelly testified after the Wilcoxes made the improvements to the Winter Camp, the owner of that property breached their lease and leased the property to someone else. Therefore, there was nowhere else they could take their cattle for the winter of 2018, and they had to put them at L&C Farms.

[4] It is unclear from the record what happened to the proceeds from this sale.

6

questions of fact about whether SSB's own conduct precluded it from asserting equitable causes of action like unjust enrichment and promissory estoppel.

[¶25] The district court granted summary judgment in favor of SSB on Kelly's remaining claims and on SSB's breach of contract counterclaim. The district court denied SSB's motion for summary judgment on its unjust enrichment and promissory estoppel counterclaims because it found there was a valid contract. SSB subsequently moved to dismiss its remaining counterclaims, and the district court granted that motion. The district court entered judgment against Kelly in the amount of $222,014.61. Kelly timely filed this appeal.

## STANDARD OF REVIEW

[¶26] Summary judgment is governed by Rule 56 of the Wyoming Rules of Civil Procedure (W.R.C.P.). Under that rule, the district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law." W.R.C.P. 56(a). "We review a district court's summary judgment ruling de novo." *Statzer v. Statzer*, 2022 WY 117, ¶ 10, 517 P.3d. 574, 578–79 (Wyo. 2022) (citing *Spence v. Sloan*, 2022 WY 96, ¶ 22, 515 P.3d 572, 578 (Wyo. 2022)).

> We afford no deference to the district court's ruling. This Court reviews the same materials and uses the same legal standard as the district court. The record is assessed from the vantage point most favorable to the party opposing the motion, and we give a party opposing summary judgment the benefit of all favorable inferences that may fairly be drawn from the record. A material fact is one that would have the effect of establishing or refuting an essential element of the cause of action or defense asserted by the parties.

*Id.,* 517 P.3d at 579 (quoting *Spence*, ¶ 22, 515 P.3d at 579) (internal citations omitted). The parties' respective burdens in supporting or opposing summary judgment are well established:

> The party moving for summary judgment bears the burden of establishing a prima facie case and showing there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Once that burden is met, the opposing party is obligated to respond with materials beyond the pleadings to show a genuine issue of material fact. When the moving party does not have the ultimate burden of persuasion, it establishes a prima facie case for summary

7

judgment by showing a lack of evidence on an essential element of the opposing party's claim.

*Statzer*, ¶ 11, 517 P.3d at 579 (quoting *Spence*, ¶ 23, 515 P.3d at 579).

## DISCUSSION

### I. Does Wyoming recognize a cause of action for negligent lending or negligent advising?

[¶27]  Although Kelly pled negligent lending and negligent advising in a single count, the district court addressed them separately, and we will do the same.

#### A. Negligent Lending

[¶28]  In her complaint, Kelly alleged SSB made loans that were likely unsustainable given the small size of her herd and the expenses she was expected to incur.  She also alleged SSB was negligent in the way it structured her loans, the way it processed and administered her loans, and in permitting losses of collateral, including the bulls that were sold pursuant to the feed lien.  She also alleged SSB was negligent by allowing her checking account to become overdrawn and in refusing to lend additional funds.

[¶29]  When analyzing this claim, the district court held: "Such a cause of action has 'not been adopted in Wyoming.'  Because the supreme court has not yet adopted such a claim, this [c]ourt will not do so. . . .  As such, the [c]ourt will grant SSB summary judgment on the negligent lending claim." (Internal citation omitted).  Kelly admits this Court has not yet recognized a claim for negligent lending, but she argues we should do so in cases involving agricultural lending because it is a highly specialized field of lending where the borrower often comes to rely on his or her banker for advice.  She alleges this case "presents egregious negligence on the part of the Bank[,]" and the facts in this case are "more than sufficient" for the Court to find SSB owed Kelly a duty to be competent.

[¶30]  In *Birt,* we stated negligent lending had not yet been adopted in Wyoming. 2003 WY 102, ¶ 50, 75 P.3d at 658 (citing John Burman, *Lender Liability in Wyoming*, XXVI Land & Water L. Rev. 707, 745 (1991)).  Professor Burman's article cited in *Birt* recognized appellate courts in other jurisdictions had "uniformly rejected a cause of action for negligent lending." Burman, *supra* at 745 (citing *Gries v. First Nat'l Bank*, 264 N.W.2d 254, 256-57 (Wis. 1978)).  In *Gries*, when declining to recognize a cause of action for negligent lending, the Supreme Court of Wisconsin stated:

> None of these observations by the plaintiffs can obscure the basic fact that it was the plaintiffs who borrowed the money to

8

> open a business. They called the bank; they prepared a proposal; they applied for the loan; they invested the money in the business. Although the failure of the business is unfortunate for both the plaintiffs and the bank, it was a risk which the plaintiffs assumed, and which can not [sic] be shifted to the bank.

*Gries*, 264 N.W.2d at 257. We agree with the reasoning in *Gries*. The Wilcoxes approached SSB and applied for multiple loans, and they invested the loan proceeds into a business which was ultimately unsuccessful. We will not adopt a cause of action that would allow them to shift the risk they assumed to SSB. We decline to recognize a cause of action for negligent lending, and we affirm the district court's grant of summary judgment on this claim.

### B. Negligent Advising

[¶31] Kelly alleges this Court "clearly recognized the viability of a negligent advising claim" in *Birt*. In *Birt*, we set forth Professor Burman's description of this cause of action. 2003 WY 102, ¶ 50, 75 P.3d at 658–59 (quoting Burman, *supra* at 743–44). According to Professor Burman, a lender's duty to render sound advice could arise in three situations: 1) when a lender "gratuitously renders advice"; 2) when a "special relationship" exists between the lender and the borrower; and 3) when "the lender participates in a specialized field of lending, such as agricultural lending, and the standard of care in that field expects such lenders to render sound advice to borrowers." *Id.* (citing Burman, *supra* at 743–44). We specifically stated: "Aside from these specialized situations, the relationship between a lender and borrower is simply that of creditor and debtor." *Id.* (citing *Martinez*, 891 P.2d at 788). Kelly alleges all three of these specialized situations are present in this case, and the advice SSB gave her was negligent. She alleges SSB gratuitously rendered advice that "covered the biggest decisions" she made including the age of the cattle she should buy, what equipment to buy, which creditors to pay, and constructing the Winter Camp without a formal loan agreement in place. In her deposition and the affidavit she filed in opposition to the summary judgment motions, Kelly testified Mr. Schneider advised her to buy first-calf heifers instead of a mixture of heifers and bred cows. Kelly alleges she followed this "heifer advice," which had "huge implications" for her operation because she had carrying costs for these heifers with no offsetting income for approximately 16 months. Kelly also alleges SSB advised her to purchase the Winnebago, which increased her debt burden.

[¶32] Kelly further alleges SSB participates in the specialized field of agricultural lending, where borrowers rely on their lender's advice. Kelly testified Mr. Schneider held SSB out as an agricultural lending institution. He told her many SSB employees grew up on family farms or ranches, and SSB had deep ties to the agricultural community. Kelly also responded to the summary judgment motions with an affidavit from her expert witness, JT

9

Korkow, who opined agricultural lending is a highly specialized field of lending that requires the lender to play a different role. He further opined agricultural lending requires experience and knowledge, and lenders tend to have more oversight over a borrower's operation. He averred agricultural borrowers tend to depend on the lender to advise them in important matters pertaining to their credit and business transactions. He opined agricultural lending requires a higher standard of care than other types of lending. He further opined Kelly viewed her relationship with Mr. Schneider as that of a guide and trusted advisor, not simply a banker, and she was drawn to accept his confident advice from the beginning of the relationship.

[¶33] When analyzing Kelly's negligent advising claim, the district court found: "Negligent advising has not been clearly recognized in Wyoming." The district court then discussed the advice Kelly testified Mr. Schneider gave her, and it indicated Mr. Schneider denied giving this advice. Rather than finding this conflicting testimony created a question of fact that should be determined at a trial, the district court made its own determination about what the evidence showed. It found the evidence showed the Wilcoxes made key decisions about their operation, and although Mr. Schneider approved various decisions, he did not advise them to take those actions. It held: "The [c]ourt will not recognize negligent advising as a claim available under Wyoming law nor under the circumstances of this case and will grant summary judgment to SSB on this claim."

[¶34] If we were to recognize a cause of action for negligent advising, we would have to remand this claim back to the district court because the record is rife with material factual disputes about what advice, if any, Mr. Schneider gave to the Wilcoxes and how much control, if any, he exercised over their operation. We can affirm the district court's decision to grant summary judgment on this claim only if we decide not to recognize this cause of action.

[¶35] "This Court has always been very cautious and deliberate in deciding whether to adopt new causes of action." *Kibbee v. First Interstate Bank*, 2010 WY 143, ¶ 56, 242 P.3d 973, 992 (Wyo. 2010) (citing *Borns ex rel. Gannon v. Voss*, 2003 WY 74, ¶¶ 34–35, 70 P.3d 262, 275 (Wyo. 2003); *Hoblyn v. Johnson*, 2002 WY 152, ¶ 22, 55 P.3d 1219, 1227 (Wyo. 2002); *Hulse v. First Amer. Title Co.*, 2001 WY 95, ¶ 48, 33 P.3d 122, 137 (Wyo. 2001); *Richey v. Patrick*, 904 P.2d 798, 802–03 (Wyo. 1995); *Cosner v. Ridinger*, 882 P.2d 1243, 1248 (Wyo. 1994)). In the past "we have been rightfully hesitant to find tort causes of actions where a contract exists." *Lee v. LPP Mortgage Ltd.*, 2003 WY 92, ¶ 27, 74 P.3d 152, 162 (Wyo. 2003) (citing *Hulse*, 2001 WY 95, ¶¶ 43, 55, 33 P.3d at 136, 139 (Wyo. 2001)).

[¶36] In *Birt*, we stated: "We have not to date recognized or adopted a general noncontractual duty that might be characterized as the duty of 'a reasonably competent banker.'" 2003 WY 102, ¶ 55, 75 P.3d at 659 (citing *Schuler v. Cmty. First Nat'l Bank*, 999 P.2d 1303, 1305 (Wyo. 2000)). *Birt* involved a common mortgage-lending situation

10

where the parties had not yet entered into a debtor/creditor relationship. *Id.* at ¶ 56, 75 P.3d at 660. We found that case did "not provide the appropriate avenue for extending liability to a lending institution in its relations with a potential customer." *Id.* at ¶ 56, 75 P.3d at 659–60. We discussed how the facts of *Birt* were different than those in the case cited in Professor Burman's article, *Production Credit Association of West Central Wisconsin v. Vodak*, 150 Wis. 2d 294, 441 N.W.2d 338, 342–43 (1989). *Id.* at ¶¶ 58–59, 75 P.3d at 660.

[¶37] In *Vodak*, "the lender had inserted itself into the borrower's business" and used its position "to dictate and control the Vodak's business decisions." *Id.* at ¶ 58, 75 P.3d at 660. The lender assumed a role similar to a managing partner or financial advisor. *Id.* The recognition of a negligent advising cause of action in *Vodak* "resulted from the lender inserting itself into the borrower's business, not from the lender's conduct in the loan application process." *Id.* Because the facts of *Birt* were fundamentally different from those in *Vodak*, we found it was not appropriate to adopt a cause of action for negligent advising in that case. *Id.* at ¶ 59, 75 P.3d at 660. We said:

> Liability to a borrower for negligent advising should only arise when the lender actively participates in the financed enterprise beyond the usual domain of the money lender. Otherwise, we will have abandoned the rule that lenders and their customers merely have a creditor and debtor relationship, and we will have subjected lenders to potential liability for negligent advising whenever a potential loan does not materialize.

*Id.* (internal citation omitted).

[¶38] When viewing the facts in a light most favorable to Kelly, this case is more like *Vodak* than *Birt*. If we were going to recognize this cause of action, this case could present us with the appropriate opportunity to do so. SSB asks us not to recognize such a cause of action in this case because the relationship between the parties is governed solely by the loan documents. The Wyoming Banker's Association filed an amicus brief urging us not to recognize such a cause of action arguing that "[i]mposing a non-contractual duty of lenders to borrowers continues to be unwarranted and could diminish the availability of loans to borrowers or increase the cost of such loans, or both."

[¶39] There is no "magic formula" which tells us whether to impose a new duty on a defendant. *Gates v. Richardson*, 719 P.2d 193, 196 (Wyo. 1986). When determining whether to recognize a duty on the part of a lender to use reasonable care when advising a borrower, we must decide "whether the [borrower's] interests are entitled to legal protection against the [lender's] conduct." *Id.* (quoting W. Page Keaton et al., *Prosser and Keaton on the Law of Torts,* § 54, 357-58 (5th ed. 1984); *Moses Inc. v. Moses,* 2022 WY 57, ¶ 14, 509 P.3d 345, 351 (Wyo. 2022) (quoting *Cornella v. City of Lander*, 2022 WY 9, ¶ 26, 502 P.3d 381, 387 (Wyo. 2022)). When making this decision, we weigh the following

11

factors announced in *Gates*:

> (1) the foreseeability of harm to the plaintiff, (2) the closeness of the connection between the defendant's conduct and the injury suffered, (3) the degree of certainty that the plaintiff suffered injury, (4) the moral blame attached to the defendant's conduct, (5) the policy of preventing future harm, (6) the extent of the burden upon the defendant, (7) the consequences to the community and the court system, and (8) the availability, cost and prevalence of insurance for the risk involved.

*Moses Inc.*, ¶ 19, 509 P.3d at 352 (citing *Lucero v. Holbrook*, 2012 WY 152, ¶ 10, 288 P.3d 1228, 1233 (Wyo. 2012)). The weight of these factors does not support imposing a noncontractual duty on a lender to use reasonable care when advising borrowers.

### 1. *Foreseeability of Harm to Wilcox*

[¶40] "Foreseeability is the most important of the *Gates* factors, and 'is the fulcrum on which duty—its existence or absence—rests.'" *Moses Inc.*, ¶ 21, 509 P.3d at 352 (quoting *Weir v. Expert Training, LLC*, 2022 WY 44, ¶ 37, 507 P.3d 442, 451 (Wyo. 2022)). "Foreseeability establishes a 'zone of risk,' which is to say that it forms a basis for assessing whether the conduct creates a generalized and foreseeable risk of harming others." *Id.* (quoting *Weir,* ¶ 37, 507 P.3d at 451). This factor requires us to decide "whether the harm was the natural and probable consequence of the negligent act." *Id.* (citing *Killian v. Caza Drilling, Inc.*, 2006 WY 42, ¶ 20, 131 P.3d 975, 984 (Wyo. 2006)).

[¶41] Lenders typically structure a loan in a way that matches the lender's assessment of the borrower's source of payment. The borrower is in the best position to determine if he or she agrees with the lender's recommendations regarding the financial aspects of his or her operations. The borrower is under no obligation to accept the lender's recommendations. If a borrower disagrees with the lender's recommendations or with the lender's terms and conditions, he or she may refuse to accept the loan and seek financing elsewhere.

[¶42] When Kelly approached SSB to apply for a loan, she prepared a business plan, a financial statement, a balance sheet, a proposed operating budget, and a five-year extended cash flow projection for her operation. SSB relied on those documents when evaluating her loan application. SSB initially denied Kelly's loan application, and the Wilcoxes returned to SSB, offering to pledge additional collateral. When Mr. Schneider presented the loan documents for the First Operating Loan and the Cattle Purchase Loan to Kelly, the loans were not structured as she expected, but she still signed the documents and accepted the loans. The Wilcoxes were concerned about being able to service their debt to SSB with

only 300 cows.  Despite these concerns, they continued to incur more debt to build the Winter Camp, even when the costs of construction greatly exceeded their initial estimate. It was not foreseeable to SSB that Kelly would ignore her knowledge and understanding of her own financial circumstances and continue to accept loans she knew or should have known she would not be able to repay.  This factor weighs against finding a duty.

### 2. *The Connection Between SSB's Conduct and the Wilcoxes' Injury*

[¶43]  "The closeness of the connection between a tortfeasor's conduct and the injury suffered is 'a corollary of foreseeability.'" *Moses*, ¶ 35, 509 P.3d at 355 (quoting *Lucero*, 2012 WY 152, ¶ 13, 288 P.3d at 1234).  This factor "considers other contributions to the harm." *Id.* (citing *Lucero*, ¶ 13, 288 P.3d at 1234).

[¶44]  The repayment of agricultural loans may be impacted by a number of factors that are outside the control of the lender or the borrower, such as drought, rain, snow, predators, regulation, and commodity prices.  SSB initially denied Kelly's loan application due to its concerns about the volatility of the cattle market.  The volatility of the cattle market did impact Kelly's ability to repay her loans.  For example, Kelly intended to sell additional cattle in November 2018 to pay down her debt to SSB, but the market for bred cows collapsed shortly before the anticipated sales date.  Given the unpredictability of these outside forces, SSB should not be subject to potential claims by Kelly that its recommendations proved to be wrong, and as a result she was unable to pay the loans as agreed and lost collateral value.  This factor weighs against finding a duty.

### 3. *Degree of Certainty that the Wilcoxes Suffered an Injury*

[¶45]  There is no doubt the Wilcoxes suffered an injury.  They lost their entire herd, which they built up over several years.  They also had to sell horses, dogs, and other personal belongings to have operating funds for the summer of 2018.  This factor weighs in favor of finding a duty.

### 4. *The Moral Blame Attached to SSB's Conduct*

[¶46]  This factor "considers a defendant's moral culpability," which "generally results from situations in which the defendant had direct control over establishing and ensuring proper procedures to avoid the harm caused or where the defendant is the party best in the position to prevent the injury." *Moses Inc.*, 2022 WY 57, ¶ 39, 509 P.3d at 356 (quoting *Weir*, 2022 WY 44, ¶ 41, 507 P.3d at 452).  Lenders and borrowers negotiate the terms of their loan agreements, and it is not unexpected that a lender will structure a loan and its conditions in a manner that protects its interests.  The borrower, who presumably understands its own operations and circumstances, can assess whether the loan conditions pose an unacceptable risk or hardship.  There is no question of moral culpability in these negotiations.  This factor weighs against finding a duty.

13

## 5. *Policy of Preventing Future Harm*

[¶47]   As noted above, the borrower is in the best position to know its own operations and whether a recommended loan structure or loan conditions would be workable.  A borrower may also seek advice from other professionals who are licensed to give advice that protects a borrower's interests, such as an accountant or attorney.  The parties have not provided us with any information suggesting that negligent advising is a prevalent issue in this state.  This factor weighs against finding a duty.

## 6. *Remaining Factors*

[¶48]   "The remaining factors are the extent of the burden upon the defendant, the consequences to the community and the court system, and the availability, cost, and prevalence of insurance for the risk involved." *Moses Inc*., ¶ 42, 509 P.3d at 356.  Imposing this duty on lenders would undoubtedly create a new risk factor for lenders considering whether to grant a loan.  This may cause a lender to deny loans and may increase the cost of the loans it does approve.  Recognizing such a duty would also recognize a new cause of action for a defaulting debtor, which would have an impact on the court system as well as lenders.  The ripple effect of the increased risk to lenders weighs against finding a duty.

[¶49]   In addition, we have expressed reluctance to impose a new duty "without a proper record and insightful analysis of whether conditions in Wyoming warrant a change." *Ortega v. Flaim*, 902 P.2d 199, 204 (Wyo. 1995).  "We believe such a change . . . must be based upon relevant data and analysis which supports the legal, social and/or economic theories behind [the change]." *Id.*  As our weighing of the *Gates* factors shows, we lack the data that would warrant judicial imposition of this new duty.  Because of the competing considerations and the lack of relevant data to support adopting such a duty, we believe the question of whether to impose an extracontractual duty on lenders to render sound advice to a borrower would be better addressed by the legislature.  "The legislature is a deliberative representative body, designed for policy debates, and designed for constituent input." *Voss*, 2003 WY 74, ¶ 34, 70 P.3d at 275.  We decline to recognize a new cause of action for negligent advising, and we affirm the district court's grant of summary judgment on this claim.

## II. *Did the district court err when it granted summary judgment in SSB's favor on Kelly's breach of good faith and fair dealing claim?*

[¶50]   "Wyoming has adopted the Restatement (Second) of Contracts § 205, which provides that 'every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.'" *Skyco Res., LLP v. Fam. Tree Corp*., 2022 WY 72, ¶ 37, 512 P.3d 11, 24 (Wyo. 2022) (quoting *Bear Peak Res., LLC v. Peak Powder River*

14

*Res.*, *LLC*, 2017 WY 124, ¶ 68, 403 P.3d 1033, 1053 (Wyo. 2017)). We have described what that covenant requires:

> The implied covenant of good faith and fair dealing requires that neither party commit an act that would injure the rights of the other party to receive the benefit of their agreement. Compliance with the obligation to perform a contract in good faith requires that a party's actions be consistent with the agreed common purpose and justified expectations of the other party. A breach of the covenant of good faith and fair dealing occurs when a party interferes or fails to cooperate in the other party's performance. The purpose, intentions, and expectations of the parties should be determined by considering the contract language and the course of dealings between and conduct of the parties. The covenant of good faith and fair dealing may not, however, be construed to establish new, independent rights or duties not agreed upon by the parties. In other words, the concept of good faith and fair dealing is not a limitless one. The implied obligation must arise from the language used or it must be indispensable to effectuate the intention of the parties. In the absence of evidence of self-dealing or breach of community standards of decency, fairness or reasonableness, the exercise of contractual rights alone will not be considered a breach of the covenant.

*Id.*, ¶ 37, 512 P.3d at 24–25 (quoting *Bear Peak*, ¶ 68, 403 P.3d at 1053–54). Breach of the implied covenant of good faith and fair dealing is a separate and distinct claim from a breach of contract claim. *Id.* at ¶ 39, 512 P.3d at 25 (quoting *Bear Peak*, ¶ 68, 403 P.3d at 1054). The two claims are not mutually dependent, and "a party may breach the implied covenant of good faith and fair dealing even if it did not breach the express terms of the contract." *Id.* (quoting *Bear Peak*, ¶ 68, 403 P.3d at 1054). "[W]hether the implied covenant of good faith and fair dealing was breached is ordinarily one of fact, focusing on the conduct alleged as constituting the breach within the context of the contract language, the parties' course of conduct and industry standards." *City of Gillette v. Hladky Const., Inc.*, 2008 WY 134, ¶ 32, 196 P.3d 184, 196 (Wyo. 2008) (citing *Scherer Constr., LLC v. Hedquist Constr., Inc.*, 2001 WY 23, ¶ 19, 18 P.3d 645, 654 (Wyo. 2001)).

[¶51] In its summary judgment motion, SSB argued this claim failed as a matter of law because the bank's actions were "in strict conformance with the clear language of the loan agreements and corresponding Loan Documents, and any action taken by SSB was an operation of its legal and contractual rights thereto." SSB alleged it fulfilled its duties when it loaned Kelly the amounts it was obligated to lend her under the loan documents. SSB characterized Kelly's "grievance" as a complaint that SSB declined to continue funding

her livestock operation. SSB claimed this was insufficient to establish any wrongdoing by SSB because it was within its legal and contractual rights to discontinue funding Kelly's operation. In her opposition to the summary judgment motions, Kelly alleged she presented genuine issues of material fact about whether SSB breached this covenant when it evaded the spirit of the parties' agreement, lacked diligence in the handling of her loans, and ultimately abused its power to dictate terms. Kelly asserted the district court needed to consider the contract language and the parties' course of dealing after the loan documents were signed, which included SSB approving Kelly's assumption of more debt than originally contemplated. Kelly argued she incurred those expenses on the express promise and commitment from Mr. Schneider that SSB would term out her existing debt and grant her another operating loan for 2018. She asserted SSB breached the duty of good faith and fair dealing when it refused to term out her existing loan or extend any additional sums, and then calling her notes due and foreclosing on her cattle.[5] She makes this same argument on appeal.

[¶52]  SSB asserts Kelly "is in essence arguing that SSB breached its duty of good faith and fair dealing when it did not lend her more money." SSB argues "[e]ven if [Kelly] expected this, SSB was under no obligation to fulfill such an expectation." Kelly had not identified any terms of the loan documents that SSB breached or had otherwise not complied with, and the district court had appropriately granted summary judgment in favor of SSB on this claim.

[¶53]  Kelly has not pointed to any provision in the loan documents that required SSB to loan her additional sums. After reviewing the record, we can find no such provision. Each loan agreement set forth a specific amount of money SSB agreed to loan Kelly. Each loan agreement also contained a provision stating the loan documents were "the complete and final expression" of the understanding between Kelly and SSB. Kelly admittedly received all the funds SSB agreed to loan her under the loan documents. Kelly cannot use the covenant of good faith and fair dealing to establish a new, independent duty upon SSB to loan her additional sums. *See, e.g. Skyco Res.*, *LLP*, 2022 WY 72, ¶ 43, 512 P.3d at 26 (citing *Scherer*, 2001 WY 23, ¶ 19, 18 P.3d at 653). The district court properly granted summary judgment in favor of SSB on this claim.

---

[5] At oral argument, Kelly asserted for the first time that SSB's actions interfered with her ability to repay her existing loans. She alleged if SSB told her in December 2017 it was not going to lend her additional money, she could have sought alternate financing with other banks or private lenders, or she could have liquidated her herd to pay the debt. SSB did not give her this opportunity. She asserted that whether this conduct violated the covenant should have been decided by a jury. However, this issue was not raised below or in the briefs filed with this Court. We generally do not consider issues not raised below, and we will not do so in this case. *See Gill v. Lockhart*, 2022 WY 87, ¶ 40 n.14, 512 P.3d 971, 983 n. 14 (Wyo. 2022) (citing *Williams v. Tharp*, 2017 WY 8, ¶¶ 10-11, 388 P.3d 513, 517 (Wyo. 2017)).

### III. Did the district court err when it granted summary judgment in SSB's favor on Kelly's breach of fiduciary duty claim?

[¶54]  "A fiduciary is defined as: 'A person having a duty, created by his own undertaking, to act primarily for another's benefit in matters connected with such undertaking.'" *Bear Peak*, 2017 WY 124, ¶ 72, 403 P.3d at 1055 (quoting *Martinez*, 891 P.2d at 790).

> We have acknowledged that a fiduciary relationship can arise in two instances.  The first arises from specific relationships, such as trustee/beneficiary and principal/agent.  The second instance is "implied in law due to the factual situation surrounding the involved transactions and the relationship of the parties to each other and to the questioned transaction."

*Id.* (quoting *Martinez*, 891 P.2d at 789) (internal citations omitted).  "The second type of fiduciary relationship exists when one party has gained the confidence of the other and purports to act or advise with the other's interests in mind." *Lee*, 2003 WY 92, ¶ 28, 74 P.3d at 163 (citing *Doe v. Hartz*, 52 F. Supp. 2d 1027, 1058–59 (Iowa 1999)).

[¶55]  A fiduciary relationship "is extraordinary and not easily created." *Mantle v. North Star Energy and Constr. Co.*, 2019 WY 29, ¶ 155, 437 P.3d 758, 807 (Wyo. 2019) (quoting *Martinez*, 891 P.2d at 789).  A "[f]iduciary duty is not created by a unilateral decision to repose trust and confidence; it derives from the conduct or undertaking of the purported fiduciary." *Lee*, ¶ 25, 74 P.3d at 162 (quoting *Martinez*, 891 P.2d at 790).  "Trust alone does not convert an ordinary arm's length transaction into a fiduciary or other similar relationship of trust and confidence." *Id.* at ¶ 26, 74 P.3d at 162.  "Because fiduciary relationships carry significant legal consequences, they cannot be the product of wishful thinking." *Mantle.* at ¶ 145, 437 P.3d at 805 (quoting *Lee*, 2003 WY 92, ¶¶ 24–28, 74 P.3d at 162–63).

[¶56]  The party "asserting a fiduciary relationship bears the burden of establishing it by clear and convincing evidence, and we will not over reach ourselves to posit such a profound circumstance." *Id.* at ¶ 155, 437 P.3d at 807 (quoting *Martinez*, 891 P.2d at 789).

> [W]e have been reluctant to impose additional duties and liability on lenders in a creditor/debtor relationship.  We have said that the relationship between a lender and its customer is contractual in nature so we impose no duties higher than the morals of the marketplace. . . . [T]his relationship between a creditor and a debtor is inherently antagonistic.

*Id.* at 145, 437 P.3d at 805 (quoting *Lee*, 2003 WY 92, ¶¶ 24–28, 74 P.3d at 162–163.  We

have recognized a lender "could incur additional duties by conduct that creates a special or fiduciary relationship." *Lee*, at ¶ 30, 74 P.3d at 163. "Generally, a confidential relationship must exist prior to, and apart from, the agreement that made the basis of the suit." *Lee*, at ¶ 29, 74 P.3d at 163 (citing *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 177 (Tex. 1997)). In her complaint, Kelly alleged SSB entered into a joint venture with her, assuming fiduciary or quasi-fiduciary duties toward her. She also alleged a fiduciary duty arose from the special relationship of trust and confidence between her and the bank, repeated assurances that SSB had a plan for her success, and the fact that SSB controlled virtually every aspect of her business. She alleged SSB breached this duty by: "extending unsustainable loans to Wilcox, failing to act in a timely and responsible manner to extend and renew the notes or provide additional operating funds, failing to prevent the TD Farms foreclosure sale, and providing negligent and misleading statements to Wilcox."

[¶57]   Kelly alleges the following circumstances support finding a fiduciary relationship: 1) SSB controlled Kelly's spending and tightly controlled decisions on how operating monies were spent and what bills were paid; 2) Mr. Crouse directly negotiated with the owner of TD Farms about her debt, without her knowledge or consent; 3) SSB provided copious advice and was deeply involved in Kelly's business decisions; 4) agricultural lending is a specialized field; 5) SSB created a special relationship with Kelly by repeatedly telling her not to worry and to trust its advice; and 6) Kelly was a relatively unsophisticated party who trusted SSB with everything she owned.

[¶58]   SSB asserts a fiduciary duty should only be found where there is "something akin to an extended course of dealings, in a long-term business setting, with a history of the borrower's reasonable reliance upon the lender . . . ." SSB asserts Kelly did not have a relationship with SSB before the loans were made in 2017, so there is nothing in the record to support her assertion that she had this kind of relationship with the bank. SSB contends the parties' relationship is solely governed by the loan documents, and Kelly failed to meet her burden of offering clear and convincing evidence that SSB assumed any duty outside of the loan documents or acted as her financial advisor.

[¶59]   It is undisputed there was no confidential relationship between Kelly and SSB prior to the loans that make up the basis of this suit. *See Lee*, at ¶ 29, 74 P.3d at 163 (citing *Schlumberger Tech. Corp*, 959 S.W.2d at 177. When viewing the evidence in a light most favorable to Kelly, it is clear she put her trust in Mr. Schneider and SSB. However, that trust, by itself, is insufficient to transform an arm's length transaction into a fiduciary relationship. *Lee*, ¶ 25, 74 P.3d at162 (quoting *Martinez*, 891 P.2d at 790). Kelly sought Mr. Schneider's advice on numerous aspects of her business. The parties disagree about whether that advice was given and whether it was reasonable for Kelly to rely on any such advice. However, even assuming Mr. Schneider advised Kelly as she claimed, there are no facts in the record showing he insisted that she follow his advice. For example, there is no evidence the Cattle Purchase Loan was contingent on her purchasing first-calf heifers or SSB would not lend her operating capital unless she purchased the Winnebago. There

18

is nothing in the loan documents that indicates SSB manifested an intention to act primarily for Kelly's benefit. *See Bear Peak*, 2017 WY 124, ¶ 72, 403 P.3d at 1055 (quoting *Martinez*, 891 P.2d at 790). We find Kelly did not present clear and convincing evidence that her relationship with SSB was anything other than that of a creditor and debtor, and she failed to meet her burden of showing this case falls into one of the extraordinary circumstances where a fiduciary relationship can be created. The district court properly granted summary judgment on this claim.

### IV. Did the district court err when it found equitable doctrines did not preclude granting summary judgment in SSB's favor on its breach of contract counterclaim?

[¶60] Kelly asserts the district court erred when it entered summary judgment in SSB's favor on its breach of contract counterclaim. She argues because of SSB's negligent advice, its breach of fiduciary duty by calling her loans due, and the explicit promises SSB made to her, SSB is estopped from asserting its breach of contract counterclaim under either equitable or promissory estoppel. She alleges she relied on Mr. Schneider's assurances he would term out her debt and extend additional operating funds. She further alleges she would not have purchased first-calf heifers, purchased the Winnebago, or incurred the Winter Camp expenses but for SSB's assurances she was in the "'seasoning period' of a long-term relationship[.]"

[¶61] SSB asserts equitable estoppel and promissory estoppel only apply when no contract exists. Because there are written contracts in this case SSB argues these equitable doctrines are inapplicable. SSB also argues Kelly failed to establish "any clear and definite promises to loan her additional money." It asserts there are no genuine issues of material fact in the record that would allow a purported defense of equitable estoppel.

[¶62] Even if we accept as true Kelly's claims that SSB made a clear and definite promise to loan her additional funds, we fail to see how that promise could be used to allow Kelly to avoid repaying the sums SSB did loan her. Kelly admitted in her deposition she owes SSB money, although she was uncertain of the amount. The district court correctly found the equitable defenses of promissory or equitable estoppel did not preclude summary judgment on SSB's breach of contract counterclaim.

### CONCLUSION

[¶63] We decline to recognize new causes of action for negligent lending or negligent advising. We find Kelly did not meet her burden of showing a fiduciary duty existed between her and SSB or that there were questions of material fact precluding the entry of summary judgment on her breach of good faith and fair dealing claim. Finally, we find the district court correctly found equitable defenses did not preclude entering summary judgment in SSB's favor on its breach of contract counterclaim. We affirm the district

court's decision.